# EXHIBIT D
# Part 1 of 3

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:                )        CDC Number B-81066
                           )
ROBERT COTE                )        **RECORDS**
                           )
_____)        **COPY**

CALIFORNIA STATE PRISON

SAN QUENTIN, CALIFORNIA

APRIL 20, 2006

PANEL PRESENT:

STEPHEN LEE, Presiding Commissioner
DYLAN SULLIVAN, Deputy Commissioner

OTHERS PRESENT:

ROBERT COTE, Inmate
JOHANNA HOFFMANN, Attorney for Inmate
LINDA DUNN, Deputy District Attorney
PATRICK MCCARTHY, Victim's next of kin
JOHN MCCARTHY, Victim's next of kin
STEPHANIE GARTHWAITE, Technical support
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No    See Review of Hearing
_____  Yes   Transcript Memorandum

**Felicia Townsend, Peters Shorthand Reporting**

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 24 |
| Pre-Commitment Factors | 15 |
| Post-Commitment Factors | 38 |
| Parole Plans | 61 |
| Closing Statements | 75 |
| Recess | 97 |
| Decision | 98 |
| Adjournment | 104 |
| Transcriber Certification | 105 |

--oOo--

1

1    P R O C E E D I N G S

2         DEPUTY COMMISSIONER SULLIVAN:   All

3    right, we're ready.

4         PRESIDING COMMISSIONER LEE:   Let's go.

5         DEPUTY COMMISSIONER SULLIVAN:   Okay.

6    We're on record in the parole suitability

7    hearing of Robert Cote.   Is it Cote or Cote?

8         INMATE COTE:   It's Cote.

9         DEPUTY COMMISSIONER SULLIVAN:   Cote, C-

10   O-T-E, CDC number B-81066.

11        PRESIDING COMMISSIONER LEE:   All right.

12   This is a subsequent parole consideration for

13   Mr. Cote Robert, CDC number B-81066.   We're

14   currently located at San Quentin State Prison.

15   The date of hearing is April 16, 2006 -- wait a

16   second, what is today's date?

17        ATTORNEY HOFFMANN:   April 20th.

18        PRESIDING COMMISSIONER LEE:   Okay.

19   April 20, 2006.   I'm going to be very careful in

20   this documentation hearing.   Inmate was received

21   on March 3, 1977 out of the County of Riverside

22   in case number CR14102.   The offense was murder

23   in the first degree pursuant to Penal Code

24   Section 187, minimum eligible for parole

25   September 20, 1983.   At this time we will make

26   our appearances.   My name is Stephen Lee, L-,

27   double, -E, Commissioner presiding.   We will go

2

1   to my right.  There's a Commissioner observing.

2        **DEPUTY COMMISSIONER SULLIVAN:**  Dylan

3   Sullivan, S-U-L-L-I-V-A-N, Deputy Commissioner

4   of parole authority.

5        **INMATE COTE:**  Robert Cote, baker number

6   -81066.

7        **DEPUTY COMMISSIONER SULLIVAN:**  Spell

8   your last name, sir.

9        **INMATE COTE:**  C-O-T-E.

10       **DEPUTY COMMISSIONER SULLIVAN:**  Thank

11  you.

12       **ATTORNEY HOFFMANN:**  Johanna Hoffmann

13  Attorney for Mr. Cote.  Spelling of the last

14  name is H-O-F-F-M-A-N-N.

15       **DEPUTY DISTRICT ATTORNEY DUNN:**  Linda

16  Dunn, D-U-N-N, Riverside County District

17  Attorney's Office.

18       **MR. MCCARTHY:**  Patrick McCarthy.  I'm

19  the son of the murder victim, McCarthy, M-C-C-A-

20  R-T-H-Y.

21       **PRESIDING COMMISSIONER LEE:**  Go ahead.

22  Counsel?  Oh, who has the button?

23       **DEPUTY DISTRICT ATTORNEY DUNN:**  There

24  we go.

25       **PRESIDING COMMISSIONER LEE:**  Okay.

26  This is -- hold on.  This is a rather

27  unique situation because we generally don't

3

1   have video and a district attorney present so we

2   apologize.  We did not forget you.

3   Would you please state your names for the record

4   please?

5          MR. MCCARTHY:  I'm John McCarthy, M-C-

6   C-A-R-T-H-Y.  I'm the victim's son.

7          MS. GARTHWAITE:  And I'm Stephanie

8   Garthwaite, G-A-R-T-H-W-A-I-T-E, Technical

9   Support.

10         PRESIDING COMMISSIONER LEE:  Thank you.

11  Both individuals are appearing on video

12  equipment and we will treat them as though they

13  were here with us.  At this time I will indicate

14  that the inmate is before us and there is a

15  document before you, sir, do you see that

16  document?

17         INMATE COTE:  Yes, sir.

18         PRESIDING COMMISSIONER LEE:  Could you

19  read that out loud to us please?

20         INMATE COTE:  It says:

21         The ADA statement.  Please ask

22         inmate to read this out loud at

23         the hearing.  The Americans with

24         Disabilities Act, ADA, is a law

25         to help people with

26         disabilities.  Disabilities are

27         problems that make it harder for

. 4

1    some people to see, hear,

2    breathe, talk, walk, learn,

3    think, work, or take care of

4    themselves than it is for

5    others.  Nobody can be kept out

6    of public places or activities

7    because of a disability.  If you

8    have a disability, you have the

9    right to ask for help to get

10   ready for the Board of Prison

11   Terms hearing, get to the

12   hearing, talk, read forms and

13   papers, and understand the

14   hearing process.  The BPT will

15   look at what you have -- what

16   you asked for and to make sure

17   that you have a disability that

18   you are covered by the ADA and

19   that you have asked for the

20   right kind of help.  If you do

21   not get the help or if you don't

22   think you got the kind of help

23   that you need, you can ask the

24   Board of Prison Terms for a 1074

25   Grievance Form and you can

26   also ask for help to fill it

27   out.

5

1          PRESIDING COMMISSIONER LEE:  Sir, did

2    you understand what you just read.

3          INMATE COTE:  Yes, sir.

4          PRESIDING COMMISSIONER LEE:  All right.

5    Now, you do have a disability?  You have

6    glasses?

7          INMATE COTE:  Yes.

8          PRESIDING COMMISSIONER LEE:  All right.

9    Are those to see far or up close?

10         INMATE COTE:  A little of both.

11         PRESIDING COMMISSIONER LEE:  All right.

12   Did you have the opportunity to use your glasses

13   when you (indiscernible) file.

14         INMATE COTE:  Yes, I have.

15         PRESIDING COMMISSIONER LEE:  Were they

16   sufficient?

17         INMATE COTE:  Yes, they are.

18         PRESIDING COMMISSIONER LEE:  All right.

19   Did you have any problems getting here?

20         INMATE COTE:  No.

21         PRESIDING COMMISSIONER LEE:  Do you

22   have any other problems regards to your hearing

23   or your eyesight?

24         INMATE COTE:  No, sir.

25         PRESIDING COMMISSIONER LEE:  Have you

26   ever been involved in triple CMS or EOP

27   programs?

6

1          INMATE COTE:   No.

2          PRESIDING COMMISSIONER LEE:   Did you

3    have to take any special education courses while

4    growing up?

5          INMATE COTE:   No.

6          PRESIDING COMMISSIONER LEE:   Counsel,

7    are there any ADA issues that we need to

8    address?

9          ATTORNEY HOFFMANN:   None that I am

10   aware of.

11         PRESIDING COMMISSIONER LEE:   All right.

12   Now, before we go any further at this point in

13   time the people have submitted to me a document

14   requesting a postponement; is that correct,

15   Counsel?

16         ATTORNEY HOFFMANN:   Yes, it is.

17         PRESIDING COMMISSIONER LEE:   All right.

18   I will indicate to all concerned that this

19   motion was brought to me earlier.   I did not

20   have accurate information and I was not able to

21   get received input from the District Attorney's

22   Office or the victim's next of kin, so at this

23   point in time I'm going to hear from both the

24   victim's next of kin as well as District

25   Attorney's Office.

26         ATTORNEY HOFFMANN:   On which issue,

27   Commissioner?

7

1        **PRESIDING COMMISSIONER LEE:**  This is

2   the request for postponement based upon the old

3   psych report.

4        **ATTORNEY HOFFMANN:**  Thank you.

5        **DEPUTY DISTRICT ATTORNEY DUNN:**  Linda

6   Dunn with the District Attorney's Office.  We

7   would prefer to go forward with this hearing.

8   There is no rule stating that there must be a

9   current psychological evaluation.  We were not

10  informed that there would be such a request.

11  Both the victim's next of kin and myself have

12  gone to a great deal of trouble to be here today

13  since there is no particular reason why a new

14  psych report would be required, we feel that

15  would be basically a violation of the victim's

16  next-of-kin right to be present at the hearing

17  to postpone it for any period of time and would

18  that the commissioner go forward as scheduled.

19  Mr. McCarthy, did you want to say anything?

20       **MR. MCCARTHY:**  Just the fact that I've

21  gone to a lot of trouble and expense to come up

22  here.  I was notified properly.  I've arrived

23  properly in time.  I've met every requirement

24  that was made of me to be here to do this and if

25  the reports wasn't filed in a timely manner I

26  think somebody didn't do their job, so I

27  shouldn't suffer the consequences of reports not

8

1  being filed properly.

2            PRESIDING COMMISSIONER LEE:   Mr.

3  McCarthy, can you hear us?

4            MR. MCCARTHY:   Yes, sir, I can.

5            PRESIDING COMMISSIONER LEE:   All right.

6  Do you have any position at this point in time?

7  Do you wish -- I'm assuming that you wish to

8  proceed at this time?

9            MR. MCCARTHY:   That would be my

10 preference.

11           PRESIDING COMMISSIONER LEE:   All right.

12           MR. MCCARTHY:   Just -- thank you.

13           PRESIDING COMMISSIONER LEE:   Okay.   At

14 this point, Counsel, would you like to be heard?

15           ATTORNEY HOFFMANN:   Yes, I would.

16 Thank you.   I just want to state that prior to

17 the beginning of this hearing today there was a

18 bunch of discussion off the record between both

19 myself, and the deputy commissioner, and

20 Commissioner Lee, as well as the district

21 attorney.   We would initially -- I had submitted

22 a request for a postponement on behalf of Mr.

23 Cote both because there was -- because there was

24 no current psychological evaluation.   The last

25 one that we have in the file is dated in 1999

26 which is over seven years ago, and it is my

27 understanding that the current policy around

9

1    psychological evaluations with the board is in

2    (indiscernible) and the last I heard about that

3    policy is that they were no longer going to be

4    doing psych evaluations and that was from a memo

5    dated January 2006 that the board issued,

6    subsequent to that I heard nothing about

7    changing any of that policy.  Since the district

8    attorney has arrived, I've heard that there are

9    in fact changes to that policy but I have yet to

10   receive any sort of notice, additionally the

11   only information that I received from the

12   district attorney in Riverside County was a

13   letter dated March 28 of 2006, indicating that

14   she was going to be appearing by way of

15   videoconference, and that letter indicated no

16   mention of any victim's next of kin attending

17   the hearing nor did I receive any prior notice

18   that they would be attending the hearing nor

19   that she would be attending in person.  I also

20   would like to indicate that I object to a

21   proceeding if that is the ruling based on the

22   fact that I don't think that it's sufficient to

23   -- it was my understanding earlier today, I'm

24   sorry, that the motion to -- for the request for

25   the request of this one hearing was in fact

26   granted and that it was -- that grant was

27   reneged upon the arrival of the district

10

1    attorney and notice of the victim's next of kin

2    were going to be attending, and I don't think

3    that's a sufficient basis to renege a previous

4    grant of a postponement.

5        PRESIDING COMMISSIONER LEE:    The

6    Counsel's objections are noted.   I will indicate

7    that she is correct, I don't like necessarily

8    like using the word renege, but I did in fact

9    grant the motion, and unfortunately that -- the

10   evidence before me at that point in time was

11   insufficient.   Apparently there was information

12   that the district attorney was coming.   There

13   was information that the district attorney had

14   indicated previously that there would be

15   victim's next of kin.   I would indicate that

16   both panel members, as well as the observers,

17   did not receive this information and therefore I

18   am -- that is the reason why I am having this

19   hearing.   Based on the information before me,

20   I'm going to deny the request for a postponement

21   and the reason for the denial is that I agree

22   with counsel, there has been a change in

23   regulations by the board, there was a memo sent

24   out to counsels indicating that there would not

25   be any psychological examinations granted --

26   request granted in the future, however, that was

27   withdrawn by the executive office approximately

11

1   60 days ago.   Unfortunately I believe counsel
2   that you were not notified of that position,
3   however, the board does have a policy that
4   postponements must be requested 30 days in
5   advance.   It was done in this particular case
6   and therefore I am following board policy at
7   this point in time.   Counsel will have the
8   appropriate (indiscernible)that she needs if
9   necessary.   At this point in time is there
10  anything that else that we need to address
11  before we begin?  All right, then we will begin
12  and again I apologize to counsels, there is a
13  document, which is a check-off list, but it has
14  nothing checked off.  We have had some issues in
15  regards to documents at this particular
16  facility.  If it becomes an issue, I want you to
17  please interrupt me so that we can discuss it.
18  I believe that we are all on the same page at
19  this point.  We know that we have a
20  psychological report.  It is a rather old
21  psychological report; it's 1991, and you have a
22  new board report.  Does everyone have the April
23  2006 Board report?
24          DEPUTY COMMISSIONER SULLIVAN:   Yes.
25          ATTORNEY HOFFMANN:   Yes.
26          PRESIDING COMMISSIONER LEE:   At this
27  point in time if there's anything else to be

12

1  submitted we will bring it up at the appropriate

2  time.   This hearing is being conducted pursuant

3  to Penal Code Sections 3041, 3042, and the rules

4  and regulations that the Board of Prison Terms

5  governing parole consideration hearings for life

6  inmates.   The purpose of today's hearing is once

7  again to consider the inmate's suitability for

8  parole.   In doing so we will consider the number

9  and nature of crimes that were committed and the

10  inmate's prior and criminal social history.   The

11  deputy commissioner will deal with the inmate's

12  behavior and programming since his commitment.

13  We will have an opportunity to discuss and

14  review the Central File.   If there are any

15  problems, please let me know.   We will consider

16  the progress since the inmate's last hearing,

17  the psychological report, and any information

18  that will have bearing on his suitability for

19  parole.   Any changes in parole plans should be

20  brought to our attention.   It is my

21  understanding, Counsel, that you have submitted

22  parole plans -- two current parole plans to the

23  panel; is that correct?

24          ATTORNEY HOFFMANN:   Yes.

25          PRESIDING COMMISSIONER LEE:   Is there

26  any other documents that you need to submit?

27          ATTORNEY HOFFMANN:   I believe that we

13

1   all have the same update letters that he

2   provided me to submit.

3           **PRESIDING COMMISSIONER LEE:**   We will

4   reach a decision today, sir, and inform you as

5   to whether or not we find you suitable for

6   parole and the reasons for our decision.   If you

7   are found suitable for parole, the length of

8   your confinement will be explained to you.

9   Before we recess for deliberations, the deputy

10  district attorney, your attorney, the victim's

11  next of kin, and you will be given an

12  opportunity to make a final statement regarding

13  your parole suitability.   Your statement shall

14  be limited to -- limited to why you feel you are

15  suitable for parole.   We will then recess, clear

16  the room, and deliberate.   Once we have

17  completed our deliberations, we will resume the

18  hearing and announce our decision.   The

19  California Code of Regulations states:   That

20  regardless of timed served, a life inmate shall

21  be found unsuitable for and denied parole, if in

22  the judgment of the panel, the inmate would pose

23  an unreasonable risk of danger to society if

24  released from prison.   The inmate has certain

25  rights; these rights include: timely notice of

26  this hearing, the right to review the Central

27  File, and the right to present relevant

14

1  documents.  Counsel, to the best of your

2  knowledge, has the inmate's rights been met?

3      ATTORNEY HOFFMANN:  Yes, they have.

4      PRESIDING COMMISSIONER LEE:  The inmate

5  has the right to be heard by an impartial panel.

6  Sir, do you have any objections to the panel?

7      INMATE COTE:  No, sir.

8      PRESIDING COMMISSIONER LEE:  All right.

9  The inmate will receive a copy of our written

10  tentative decision today.  That decision becomes

11  effective within 120 days.  A copy of the

12  decision and a copy of the transcript will be

13  sent to you.  If you have an appeal -- we no

14  longer have an appeal.  You have a grievance

15  procedure pursuant to administrative 04/01.  At

16  this time, sir, would you raise your right hand?

17      PRESIDING COMMISSIONER LEE:  Wrong

18  hand.

19      INMATE COTE:  Yes, sir.

20      PRESIDING COMMISSIONER LEE:  At this

21  time, do you solemnly swear to tell the truth,

22  the whole truth, and nothing but the truth?

23      INMATE COTE:  Yes, I do.

24      PRESIDING COMMISSIONER LEE:  All right.

25  Counsel, is your client going to discuss with us

26  the facts of the case?

27      ATTORNEY HOFFMANN:  He is.

15

1          **PRESIDING COMMISSIONER LEE:**  All right.

2          **ATTORNEY HOFFMANN:**  And I think before

3    we does that he wants to make a brief statement.

4          **INMATE COTE:**  (indiscernible).

5          **ATTORNEY HOFFMANN:**  Oh, apparently

6    plans have changed on his end.

7          **PRESIDING COMMISSIONER LEE:**  Sir, Mr.

8    Cote, You've never appeared before me.  I will

9    stop the hearing on numerous occasions.  I will

10   stop the hearing after I go through the first

11   section, which would be your past of your social

12   history, your priors, if any, and the facts of

13   the case, I will also stop it after the deputy

14   commissioner is done, which is dealing be your

15   present, which is your programming as well as

16   your psychological report, and I will also at

17   that point in time at the end of the hearing

18   allow you to make your comments, your statement,

19   so I will stop at each portion to allow you to

20   clarify on various aspects of what I have

21   discussed.  Sometimes things are inaccurate.

22   Sometimes I misstate things so I just want to

23   make sure that you know that you have an

24   opportunity to clarify anything that needs to be

25   clarified.  At this point in time then we are

26   ready to proceed.  I will indicate as follows:

27   the inmate was born on November 17, 1956.  The

16

1   inmate apparently was born in Connecticut.  He

2   was the third of seven children.  His oldest

3   sister died of cancer.  He has a brother in a

4   wheelchair who suffers from pituitary problem.

5   Inmate indicated his mother has a seizure

6   disorder, and he also has seizures himself.

7   Sir, do you take medication for that?

8           INMATE COTE:  Yes, I do.

9           PRESIDING COMMISSIONER LEE:  Okay, did

10  you take your medication for today?

11          INMATE COTE:  Yes, sir.

12          PRESIDING COMMISSIONER LEE:  All right.

13  Is that Epilepsy or is that something else?

14          INMATE COTE:  Epilepsy.

15          PRESIDING COMMISSIONER LEE:  Okay, and

16  the last time you had a seizure was over four

17  years ago?

18          INMATE COTE:  No, it was February 26 or

19  February 27th something like that.

20          PRESIDING COMMISSIONER LEE:  Recently?

21          INMATE COTE:  Yes, recently.

22          PRESIDING COMMISSIONER LEE:  Have you

23  seen a doctor since then?

24          INMATE COTE:  Yes, sir, I have.

25          PRESIDING COMMISSIONER LEE:  Are they

26  increasing your medication or it's stable.

27          INMATE COTE:  It's stable right now.

17

1    It's all right.

2              PRESIDING COMMISSIONER LEE:  Okay.  Is

3    it connected to lighting or anything else?

4              INMATE COTE:  No.

5              PRESIDING COMMISSIONER LEE:  His family

6    moved from Connecticut to southern California in

7    1963 when he was six or seven.  His mother still

8    lives in Riverside, California.  The inmate is

9    in touch with her by both phone and writing.

10   Apparently she is in poor health.  The inmate

11   divorced -- I mean the inmate's parents divorced

12   when the inmate was about 12 or 13.  The

13   inmate's father was killed by a drunk driver in

14   February of 1983.  The inmate went his own way

15   since the age of 12.  The inmate reports a good

16   relationship with his mother and hopes to live

17   with her when paroled.  Sir, what does it mean

18   that 'I went my own way at the age of 12?'

19             INMATE COTE:  I pretty much started

20   doing my own thing.  Father and son thing, I

21   mean we both were bumping heads.  We were both

22   clashing.

23             PRESIDING COMMISSIONER LEE:  All right,

24   so what you're saying to me is you went your own

25   way at the age of 12.  Does that mean you got a

26   house or you just didn't --

27             INMATE COTE:  No, I stayed in the

18

1  house, however, he was doing his thing I was

2  doing mine.  I wasn't all that good of a kid.

3          PRESIDING COMMISSIONER LEE:  All right.

4  What about your mother?

5          INMATE COTE:  She stayed there for a

6  while as well.

7          PRESIDING COMMISSIONER LEE:  Okay.

8  Now, the inmate indicates that at an early age

9  he was molested by his father; is that correct?

10          INMATE COTE:  Yes, sir.

11          PRESIDING COMMISSIONER LEE:  All right.

12  At that point in time did you -- I mean, did you

13  know what was going on at that time?

14          INMATE COTE:  No, not really.

15          PRESIDING COMMISSIONER LEE:  Okay.  Is

16  this something that came back to you later or is

17  this something that you always knew about?

18          INMATE COTE:  I've never forgotten some

19  of the things, you know what I mean?

20          PRESIDING COMMISSIONER LEE:  Were you

21  ever able to report this to anyone?

22          INMATE COTE:  No, I didn't want to hurt

23  my mom.

24          PRESIDING COMMISSIONER LEE:  All right.

25  When was the first time you brought this up?

26  Was it while incarcerated?

27          INMATE COTE:  It was just before I was

19

1    incarcerated and then several months after I

2    came in the adjustment center.

3        PRESIDING COMMISSIONER LEE:   Were you

4    ever able to get any type of therapy?

5        INMATE COTE:   Oh, yes, many times.

6        PRESIDING COMMISSIONER LEE:   We will

7    get into that once we turn it over to the deputy

8    commissioner.   The inmate has never been

9    married.   The inmate apparently has a son about

10   23 years of age.   Do you have any contact?

11       INMATE COTE:   No, and I believe he's a

12   little older than that.

13       ATTORNEY HOFFMANN:   He was 23 in '99,

14   so --

15       PRESIDING COMMISSIONER LEE:   My

16   apologies.

17       ATTORNEY HOFFMANN:   He's aged.

18       PRESIDING COMMISSIONER LEE:   A little

19   bit older now.   Any particular reason or you

20   just haven't been able to contact him?

21       INMATE COTE:   He lives out in Arizona

22   and I live out here.

23       PRESIDING COMMISSIONER LEE:   Okay.   The

24   inmate served in the military for a few months.

25   It appears that the inmate was expelled from the

26   military for fighting with a sergeant.

27   Apparently the inmate was pressured into going

20

1   into the service from the juvenile judge.

2   Unfortunately, having been a juvenile judge, I

3   can understand that.  The inmate apparently has

4   a long and significant drug and alcohol history.

5   Appears to began smoking cigarettes and drinking

6   alcohol at the age of 10.  He also began to use

7   marijuana at the age of 13.  He says he used it

8   almost daily from the age of 14.  The inmate has

9   tried codeine, LSD, PCP, reds and yellow

10  jackets.  The inmate used heroin for a period of

11  six months prior to the time of the crime.  The

12  inmate was a heavy amphetamine user in 1968

13  until the time of his arrest.  Sir, how were you

14  ingesting the methamphetamine?  What it

15  intravenously?

16       INMATE COTE:  Well, 90 percent of the

17  time, yes.  The use of heroin was longer than

18  six months.

19       PRESIDING COMMISSIONER LEE:  Okay.  So

20  six months prior to your arrest so a year

21  before?

22       INMATE COTE:  Probably a year and a

23  half close to two years.

24       PRESIDING COMMISSIONER LEE:  Inmate

25  indicates that he stopped his abuse of drugs.

26  All right.  The inmate's priors are as follows:

27  According to the board report it indicates that

21

1   the inmate's juvenile record was over traffic

2   violation; is that correct?

3          INMATE COTE:  Yes, sir, 13 of them to

4   be exact.

5          PRESIDING COMMISSIONER LEE:  Okay.

6   Well, you don't drive very well.  How did a

7   juvenile judge get you to go into the service?

8   There's no confinement time for traffic

9   violations.

10         INMATE COTE:  I was in there -- I was

11  in a -- I can't remember the name of the -- it's

12  been a long time since I've -- I can't remember

13  the juvenile hall, but I got arrested one day

14  while in my car and they took me right to the

15  juvenile hall where the old hospital used to be

16  right across the way from there.  Then there was

17  some conversation with my dad and the judge and

18  the next thing you know --

19         PRESIDING COMMISSIONER LEE:  You were

20  in service?

21         INMATE COTE:  Yeah.

22         PRESIDING COMMISSIONER LEE:  Apparently

23  you had a temper.  You got in a fight with your

24  sergeant?

25         INMATE COTE:  Alcohol and drugs don't

26  mix.

27         PRESIDING COMMISSIONER LEE:  Do you

22

1   still think you have an anger problem?

2          INMATE COTE:  No.

3          PRESIDING COMMISSIONER LEE:   What

4   changed?

5          INMATE COTE:  Well, I believe in

6   odemism (phonetic).

7          INMATE COTE:  I'm an odemness.  I

8   believe in odes some of the old biking religion.

9          PRESIDING COMMISSIONER LEE:  Oh, Odem.

10         INMATE COTE:  Yes.

11         PRESIDING COMMISSIONER LEE:  Oh, okay.

12  What the --

13         INMATE COTE:  Exactly.

14         PRESIDING COMMISSIONER LEE:  Okay.  So

15  that -- now, how did that change you from being

16  in anger management?

17         INMATE COTE:  Part of their studies and

18  a lot of their religion tell you it's not really

19  -- they try to tell you it's not cool to sit

20  there and to show vulgar displays of ignorance

21  or hostilities around woman or children.  You're

22  not even supposed to course around women or

23  children.  I kind of like that because it gives

24  me a little bit of order.  You try to respect

25  all animals, everybody, everything.

26         PRESIDING COMMISSIONER LEE:  How long

27  have you been involved in this?

23

1    INMATE COTE:  The last 10 years.

2    PRESIDING COMMISSIONER LEE:  Good.  Is

3  that something that you picked up here in prison

4  or is that something that you started while you

5  were out on the streets?

6    INMATE COTE:  I picked it up while in

7  prison.

8    PRESIDING COMMISSIONER LEE:  All right.

9  Now, is this primarily a Caucasian organization?

10    INMATE COTE:  No, they have what's

11  called other tribes and they do have other

12  tribes of Hispanic dissent.  Rumor has it -- I

13  don't know personally myself, but I've heard the

14  Africans Americans are trying to get into the

15  same too as well.

16    PRESIDING COMMISSIONER LEE:  Do you

17  associate with them?

18    INMATE COTE:  Yes, sir, everyday daily.

19    PRESIDING COMMISSIONER LEE:  Okay.  At

20  this point in time the only other conviction

21  that the inmate has based upon the report is a

22  conviction for burglary.  He received a two-year

23  probation, two days in the county jail.  What

24  was that about, sir?

25    INMATE COTE:  I went out driving with a

26  friend of mines once under the impression we

27  were going to go get some dope we ended up at

24

1   somebody else's house in Burbank, California.

2   He goes -- well, I thought he was going in the

3   house and he did something and we get busted.

4        PRESIDING COMMISSIONER LEE:   Okay.   And

5   so basically you paid a fine and spent two days

6   in the county jail?

7        INMATE COTE:   Yes, sir.

8        PRESIDING COMMISSIONER LEE:   At this

9   point in time let's go into the facts of the

10  case.   The facts of the case are being taken

11  from the crime summary from the April 2006 board

12  report.

13       ATTORNEY HOFFMANN:   Can I interrupt you

14  for a second?   I'm just concerned with the

15  little what the upside down.   Does he

16  (indiscernible) need that?

17       PRESIDING COMMISSIONER LEE:

18  (indiscernible)

19       ATTORNEY HOFFMANN:   Okay.   I just

20  wanted to make sure.

21       PRESIDING COMMISSIONER LEE:   All right.

22       On September 17, 1976 at

23       approximately 10:15 p.m.

24       officers of the Riverside County

25       Sheriffs Department responded to

26       the area of Byron and Magnolia

27       Street on call by witnesses of a

25

1  possible rape in progress. Upon

2  arrival, they witnesses H.

3  Kelly, K-E-L-L-Y, who advise

4  them that a woman was being

5  raped in the vegetable garden

6  behind his apartment. The

7  witness recorded that as he was

8  taking his dog outside, he heard

9  this commotion in the garden

10  area. As he approached the

11  area, he observed a male subject

12  who appeared to be kneeling over

13  a female while beating her. He

14  as recalled seeing the victim's

15  legs kicking upward from the

16  ground. He was able to give a

17  sketchy description of the

18  individual and clothing he was

19  wearing. A check of the garden

20  area revealed the deceased new

21  body of a female later

22  identified as Rose McCarthy.

23  The victim's face was badly

24  damaged, covered with blood, and

25  her blouse had been pulled up

26  and wrapped around her neck.

27  Teeth marks were later observed

26

1   on her shoulder and her breast.

2   The cause of death was

3   determined to be aspiration of

4   blood to the internal oral

5   hemorrhaging due to trauma to

6   the face.  A search of the

7   immediate area revealed

8   clothing, apparently belonging

9   to the victim, and a belt with

10  the inscribed name Bob Cote.

11  Officers subsequently responded

12  to the inmate's residence where

13  the inmate was found asleep in

14  his bedroom.  A pair of dirt

15  covered and blood-soaked jeans

16  were found on the floor, and

17  several spots of blood were

18  visible on the bed sheets, which

19  he was placed under arrest.  In

20  addition, officers located a

21  yellow shirt with dark stripes

22  on the ground near the

23  intersection of (indiscernible)

24  and Magnolia.  The shirt was

25  stained with blood and dirt.  On

26  October 20, 1976, excuse me;

27  inmate entered the plea of not

27

1           guilty and with non-special

2           allegations.  Apparently the

3           inmate entered the plea of not

4           guilty by reason of insanity

5           whereupon doctors were appointed

6           to examining.  The inmate

7           apparently had a trial by court.

8           The judge found the inmate

9           guilty which is the offense of

10          first degree.

11   At this time, sir, before we go any further we

12   did go over some of the aspects that I have

13   discussed with you, however, is there any

14   inaccuracies any misstatements that need to be

15   cleared up at this point in time?

16          INMATE COTE:  No.

17          PRESIDING COMMISSIONER LEE:  Everything

18   is about accurate in what I've said so far?

19          INMATE COTE:  Somewhat.

20          PRESIDING COMMISSIONER LEE:  Okay,

21   which part is not?

22          INMATE COTE:  I believe that at the

23   time that they said was happening that stuff was

24   going down.  Well, no, I'll just go ahead and

25   say that there was not a rape being in progress.

26          PRESIDING COMMISSIONER LEE:  All right,

27   we'll get into that --

28

1    INMATE COTE: We'll get into that in a
2    little bit but.

3    PRESIDING COMMISSIONER LEE: Okay. All
4    right, but as far as your priors, as far as your
5    social history all that information is accurate?

6    INMATE COTE: Yes, sir.

7    PRESIDING COMMISSIONER LEE: Well,
8    let's discuss this. The inmate did make a
9    statement. I'm not going to read the
10   statements, but he does indicate that he wishes
11   to discuss this. What would you like to tell me
12   about what occurred?

13   INMATE COTE: I can't remember
14   everything that I've discussed with my counselor
15   but I'll paraphrase it as best that I can. On
16   the night that this happened, I started drinking
17   early on in the afternoon probably more closer
18   to the morning. I started going to work with a
19   friend of mine named Frank. Well in the morning
20   a friend of Frank's would come up over. We'd be
21   -- they would be talking doing whatever under
22   their breath and coming back with beer after a
23   while. I started drinking.

24   PRESIDING COMMISSIONER LEE: Okay.

25   INMATE COTE: I also produced some
26   pills that I had myself, reds to be exact.

27   PRESIDING COMMISSIONER LEE:

29

1    (indiscernible), correct?

2             INMATE COTE:    Correct.

3             PRESIDING COMMISSIONER LEE:    And we all

4    started partying and at the same time we were

5    working, which didn't go out right because

6    that's not -- in the morning's temperature, it

7    got up -- It got a little warm so did I our

8    temperature I guess and we just started getting

9    drunk and was like that pretty much for the

10   whole day, for beer and by the end of the day

11   Frank had asked us -- or Steve had asked us if

12   we wanted to go get some more beer and some

13   drugs and we said yeah.    Well, we all put our

14   money together and we went to this bar.    We left

15   and went to this bar.    I don't even know how we

16   got there.    I know we got in Frank's car.    We

17   got there.    We started drinking while we were in

18   there.    We come across the heroin or some not

19   all, because Steve had stated that he had to go

20   some place -- we had to go to another place to

21   get the heroin.    Well, I -- they had brought

22   some and I used a little bit that night.    Well,

23   when we left we was getting pretty bad.    All of

24   us was getting pretty loaded.    We left to go to

25   where Steve said this -- the heroin was at.    We

26   got there we noticed that there was this

27   hamburger stand probably right across the street

30

1    -- a taco and whatever you want to call it.  We

2    go there and we try to eat.  That wasn't

3    happening.  I wasn't in a very good mood due to

4    drinking and the drugs.  I was a little loud and

5    a little obnoxious.  Steve came other shortly

6    thereafter and said that the person with the

7    heroin was trying to burn us.  I didn't receive

8    that information too well.  I kind of got a

9    little mad.  Steve identified the individual

10   that was walking up toward us as the individual

11   who had the heroin and I just kind of looked and

12   it was a woman and I didn't -- I don't remember

13   the exact words that we were talking.  I asked

14   her if she was going to give us our heroin or

15   our money, and she was acting like she didn't

16   know what I was talking about.

17            PRESIDING COMMISSIONER LEE:  Where was

18   this?

19            INMATE COTE:  This was in Riverside.

20            PRESIDING COMMISSIONER LEE:  Where?

21            INMATE COTE:  I can't remember the area

22   it was called Home Gardens.

23            PRESIDING COMMISSIONER LEE:  Okay.

24            INMATE COTE:  I can't remember the

25   exact area or cross street but that's the best I

26   can tell you it was Home Gardens this little

27   hamburger garden there.  But like a said she was