# EXHIBIT D
# Part 2 of 3

31

1  acting like she didn't know what I was talking

2  about so I started walking across the street

3  with her and Steve had just come and I was

4  trying to ask him what the heck is happening and

5  there was some commotion between them two.

6  Well, Frank started coming and asked if I wanted

7  to go with him and I said well we had to wait I

8  wanted to get my money or my dope, and at this

9  time she's -- I'm -- I can't say she was playing

10  that she didn't know it she probably didn't

11  maybe I was the one getting played. Maybe me

12  and Frank were the ones getting played. I don't

13  know, but at that time particular time the

14  heroin started kicking in and the alcohol

15  started kicking in. Well, I said some real bad

16  things to Steve and it looked like he didn't

17  like it -- well, he really didn't like it and he

18  started hitting me from behind and I had thought

19  I had started hitting him back but ended up

20  being Ms. McCarthy. It's getting a little hard

21  right now.

22            PRESIDING COMMISSIONER LEE:  Take your

23  time.

24            INMATE COTE:  But that's basically what

25  happened. I mean I went down on the ground,

26  because I got hit from behind. I thought --

27  well, Frank had left. Steve was there for a few

32

1    moments.  Then after that it was pretty much a

2    blur.  I do admit to the family, you know, that

3    I did do that.

4            PRESIDING COMMISSIONER LEE:   Is that as

5    much as you remember right now?

6            INMATE COTE:   Pretty much.

7            PRESIDING COMMISSIONER LEE:   You've

8    been in prison approximately 30 years; is that

9    correct?

10           INMATE COTE:   Yes, sir.

11           PRESIDING COMMISSIONER LEE:   All right.

12   How do you feel about the death of this woman?

13   Apparently you've indicated that you are

14   responsible for it?

15           INMATE COTE:   I feel pretty bad.   I was

16   sitting in the county jail once -- or excuse me,

17   I was sitting in the chair kicking back

18   listening to the judge speak and I thought that

19   he was going to go ahead and give me the death

20   penalty and I figured that might appease the

21   family.   I was pretty much okay with that but

22   they didn't give it to me.   I lay in my cell

23   every night thinking about well how do you atone

24   for this, you don't.   I feel pretty bad about

25   it.

26           PRESIDING COMMISSIONER LEE:   Now,

27   during the trial apparently there was some

33

1    examinations done and there were some remarks

2    about brain damage and things of that nature you

3    also made some statements and they're not

4    consistent with the statements that you've made

5    today.

6           INMATE COTE:  I know that.

7           PRESIDING COMMISSIONER LEE:  Okay.  So

8    you weren't fighting with Mexicans?  You didn't

9    get bit by a dog?

10          INMATE COTE:  No.  There was dogs in

11   the area, but no I didn't --

12          PRESIDING COMMISSIONER LEE:  Okay

13   listen to my question.  Did you lie --

14          INMATE COTE:  Yes, sir.

15          PRESIDING COMMISSIONER LEE:   -- or did

16   you, okay you lied.

17          INMATE COTE:  I didn't think I was

18   capable of that.  I didn't think I was capable

19   of taking a human life.  I was always under the

20   impression that -- well, not under the

21   impression.  I thought that what I was going to

22   do is just hope to god that the police was going

23   to find somebody else, you know what I mean,

24   that somebody else had done it not me.  I was

25   kind of hoping that but it didn't work out like

26   that.

27          PRESIDING COMMISSIONER LEE:  That

34

1  evening you indicated that you were under the

2  influence of various drugs.  Now I think you

3  said alcohol what else?

4          INMATE COTE:  I did (indiscernible) a

5  lot of methamphetamines and some PCP, some

6  heroin.

7          PRESIDING COMMISSIONER LEE:  That same

8  night?

9          INMATE COTE:  The same night was

10  heroin, alcohol, a little bit of weed, some

11  reds.

12          PRESIDING COMMISSIONER LEE:  Have you

13  learned anything over the last 30 years?

14          INMATE COTE:  Yeah.

15          PRESIDING COMMISSIONER LEE:  What have

16  you learned?

17          INMATE COTE:  Other than the fact that

18  alcohol is what put me in here alcohol is what's

19  going to keep me out.  Alcohol and drugs don't

20  mix.  Because of drugs it not only hurts one

21  life it hurts many lives.  That's about it.

22  That's all I got to say about that right now.

23          PRESIDING COMMISSIONER LEE:  Have you

24  changed?  You were 20 when this occurred,

25  correct?

26          INMATE COTE:  19.

27          PRESIDING COMMISSIONER LEE:  Have you

35

1  changed?

2      INMATE COTE:  Drastically.

3      PRESIDING COMMISSIONER LEE:  How?

4      INMATE COTE:  I'm a better person

5  nowadays.

6      PRESIDING COMMISSIONER LEE:  What does

7  that mean?

8      INMATE COTE:  I was hell bent on --

9  excuse my language.  I was bent on trying to get

10  back at my dad.  I didn't care how I was going

11  to get back at him for everything he's done to

12  my mother, my brother's, my sister's, myself.

13  It didn't matter.  I didn't care how I was going

14  to get back at him.  I was just going to lash at

15  him and I didn't care.  Nowadays I care about

16  what I do.

17      PRESIDING COMMISSIONER LEE:  You don't

18  do that anymore?

19      INMATE COTE:  No.

20      PRESIDING COMMISSIONER LEE:  Have you

21  reconciled with your father?

22      INMATE COTE:  I've tried to talk to him

23  a few times before he died but I -- he -- he

24  didn't want to say anything so.

25      PRESIDING COMMISSIONER LEE:  Have you

26  had any therapy or group counseling in regards

27  to the problem with your father?

36

1    **INMATE COTE:**  I've talked -- I've had

2    one-on one at CMC East.  I've talked about it.

3    **PRESIDING COMMISSIONER LEE:**  Has that

4    helped you?

5    **INMATE COTE:**  It's given me some

6    insight, you know what I mean, to me.  It's

7    because of what he did that I shouldn't have to

8    take it out on anybody else.

9    **PRESIDING COMMISSIONER LEE:**  Do you

10    believe that helped you with your anger?

11    **INMATE COTE:**  Yes, it has.

12    **PRESIDING COMMISSIONER LEE:**  I'm not

13    exactly sure this came out at the trial but I

14    would like to refer to your report, it indicates

15    that there were witnesses who indicated that you

16    were in a stand or some kind of stand when

17    apparently you became familiar with a woman and

18    started kissing her and hugging her, you don't

19    remember anything like that?

20    **INMATE COTE:**  No.  The only person that

21    was there was what I was telling you.  Now -- I

22    know her name now it's Monique (indiscernible)

23    and there was --

24    **DEPUTY COMMISSIONER SULLIVAN:**  Sir,

25    make sure you keep your voice up okay?  We're

26    not picking up everything you're saying and I

27    want to make sure that we get a good report.

37

1          INMATE COTE:  Sorry.

2          DEPUTY COMMISSIONER SULLIVAN:  That's

3    okay.

4          INMATE COTE:  There was no -- when we

5    were standing next to each other I don't believe

6    there was any kind of hugging or kissing of

7    anything of that nature.  I mean I was trying to

8    eat a burrito and at the same time it was coming

9    out as it was going -- just as fast as it was

10   coming in.  I wasn't being able to hold anything

11   down, so other than the fact that maybe we were

12   trying to hold each other up, there wasn't --

13   there was no hugging and kissing going on.

14         PRESIDING COMMISSIONER LEE:  Okay.  So

15   the other individuals apparently were

16   intoxicated as well?

17         INMATE COTE:  All three of us were.

18         PRESIDING COMMISSIONER LEE:  Didn't

19   your friends leave you at some point in time?

20         INMATE COTE:  Toward the end, yeah,

21   they all -- they were all gone.

22         PRESIDING COMMISSIONER LEE:  Is there

23   anything else you'd like to tell the panel in

24   regards to the areas that I've touched so far

25   the offense itself, your priors, or your social

26   history?

27         INMATE COTE:  Not at this time, no.

38

1        PRESIDING COMMISSIONER LEE:  Do you

2   intend to go back to living with your mother?

3        INMATE COTE:  If I can get a job out on

4   my own if would go back East once I get out.

5        PRESIDING COMMISSIONER LEE:  Whose back

6   East?

7        INMATE COTE:  I have family back East

8   in Oregon, Connecticut.

9        PRESIDING COMMISSIONER LEE:  And is

10  that on your father's side or your mother's

11  side?

12       INMATE COTE:  Both.

13       PRESIDING COMMISSIONER LEE:  All right.

14  At this point in time I'm going to turn it over

15  to the deputy commissioner.  The deputy

16  commissioner will discuss with you're your

17  programming as well as your psychological

18  report.

19       DEPUTY COMMISSIONER SULLIVAN:  Good

20  afternoon, sir.

21       INMATE COTE:  How are you doing?

22       DEPUTY COMMISSIONER SULLIVAN:  I'm

23  doing all right, are you doing?

24       INMATE COTE:  I've been better.

25       DEPUTY COMMISSIONER SULLIVAN:  I

26  believe that.  Sir, I'm going to be discussing

27  with you your institutional adjustment and

39

1  focusing on the things that have happened since

2  your last hearing.  I may cover things that have

3  happened during your entire incarceration but

4  the focus will definitely be since the last time

5  you appeared in front of the board.  I'm going

6  to give you a chance to clarify anything that I

7  talk about or add anything about your

8  institutional adjustment that you think is

9  important for us to consider in determining

10  whether or not we believe that you are suitable

11  for parole, okay?

12          INMATE COTE:  Okay.

13          DEPUTY COMMISSIONER SULLIVAN:  The last

14  time that you made an appearance in front of the

15  board was March 14, 2000, at that time you were

16  denied three years told to become disciplinary

17  free, upgrade educationally, and participate in

18  self-help and therapy.  Now, I understand that

19  there is also a stipulation that occurred in the

20  in term between now and then but I don't have

21  document of it.

22          ATTORNEY HOFFMANN:  It's mentioned on

23  page five of the April 2006 board report.

24          DEPUTY COMMISSIONER SULLIVAN:  Sir, did

25  you stipulate a couple of years ago?

26          INMATE COTE:  In 2003, I stipulated to

27  two years.

40

1       DEPUTY COMMISSIONER SULLIVAN:  Okay.
2   You are a level two inmate?
3       INMATE COTE:  Yes, sir -- yes, ma'am,
4   excuse me.
5       DEPUTY COMMISSIONER SULLIVAN:  That's
6   all right.  Housed medium AR custody with a
7   classification score of 19.
8       INMATE COTE:  How is it?
9       DEPUTY COMMISSIONER SULLIVAN:  With a
10  classification score of 19, sir?
11      INMATE COTE:  Oh.
12      DEPUTY COMMISSIONER SULLIVAN:  Housed
13  AR, Medium AR, level 2?
14      INMATE COTE:  That sounds right, if
15  that's what you're trying to ask me, I mean, I
16  don't understand what you're trying to say.
17      DEPUTY COMMISSIONER SULLIVAN:  Sir, can
18  you hear me okay?
19      INMATE COTE:  Yes, I can hear you.
20      DEPUTY COMMISSIONER SULLIVAN:  Okay,
21  I'm not trying to ask you anything.  I'm just --
22      INMATE COTE:  Oh.
23      DEPUTY COMMISSIONER SULLIVAN:  --
24  stating what your custody says here.
25      INMATE COTE:  I'm sorry, I'm kind of --
26      DEPUTY COMMISSIONER SULLIVAN:  That's
27  all right.  That's why I was asking you if you

41

1    can hear me, because if you can't hear me I want

2    to make sure you can.

3              INMATE COTE:   I can hear you.

4              DEPUTY COMMISSIONER SULLIVAN:   Okay.

5    Since your incarceration you have 31, 115s the

6    last of which was May 3, of '01 for possessing

7    Pruno?

8              INMATE COTE:   Yes.

9              DEPUTY COMMISSIONER SULLIVAN:   And I

10   read that 115 carefully, it looks like you had

11   two-and-a-half pounds -- two-and-a-half gallons,

12   I'm sorry, of Pruno and that you pled not guilty

13   but were found guilty?

14             INMATE COTE:   Yes, ma'am.

15             DEPUTY COMMISSIONER SULLIVAN:   You have

16   a lot of 115 so I'm just going to hit the

17   highlights things that I think are important for

18   us to consider.  You have three 115s for

19   pressuring others and/or being involved in a

20   pressured group from '95 to '96, you have two

21   physical altercations, one in '91 in '92, you

22   have two instances of using force and violence

23   in 8/7, and you were found to be under the

24   influence in '81.  And that's not to say that

25   the other disciplinaries aren't important but I

26   thought I would lit the highlights.  You also

27   have five 128 counseling Chronos, the last of

42

1   which was on March 24, '03 in inciting, and in
2   that gang you also have gang affiliation with
3   the skinheads.  The last classification that I
4   read was in '03, and that was still being
5   reported.  Are you still affiliated with the
6   skinheads?
7          INMATE COTE:  I've never been a
8   skinhead.  I hang around with a lot of people.
9          DEPUTY COMMISSIONER SULLIVAN:  Okay.
10  I'm not asking you if you are a member.  I'm
11  asking you whether you associate yourself or
12  affiliate -- whether you run around on the yard
13  with people that are skinheads or not?
14         INMATE COTE:  It's kind of hard not to
15  run into everybody, you know.  You're on a yard
16  -- you're on a real small yard with a lot of
17  people.  Everybody's got their own little area.
18  The whites have their own little area.  It's
19  kind of hard not to be around them.
20         DEPUTY COMMISSIONER SULLIVAN:  Okay.  I
21  also saw a Chrono in here from May 20, '01 where
22  you were refusing to eat; what was that about?
23  The institution was on lockdown and --
24         INMATE COTE:  Yeah, there was -- they
25  weren't treating us rather well and we just
26  decided not to eat one night; that was it.
27         DEPUTY COMMISSIONER SULLIVAN:  Okay.

43

1   In terms of self-help and therapy, I see that

2   you are on the religion advisory committee in

3   '01; are you still participating in that?

4          INMATE COTE:  Yes, ma'am.

5          DEPUTY COMMISSIONER SULLIVAN:  On the

6   advisory committee?

7          INMATE COTE:  Well, not here.  They got

8   other people that does that but I've worked with

9   Captain Williams trying to establish our

10  religion here.

11         DEPUTY COMMISSIONER SULLIVAN:  Okay.  I

12  also see that you've participated in Alcoholic's

13  Anonymous from 99 to '03.  The last Chrono that

14  I see in there is from the beginning of '03, are

15  you currently involved in NA or AA --

16         INMATE COTE:  No.

17         DEPUTY COMMISSIONER SULLIVAN:  Or any

18  kind of substance abuse treatment?

19         INMATE COTE:  No.  My time is taken up

20  in school, work and school.

21         DEPUTY COMMISSIONER SULLIVAN:  Okay.

22  Well, I'm going to be real frank with you, sir,

23  your commitment offence it appears to be from

24  reading the probation report and talking to you

25  here today that you were very intoxicated --

26         INMATE COTE:  That's right.

27         DEPUTY COMMISSIONER SULLIVAN:  -- and

44

1   that you had a serious drug and alcohol problem

2   at the time. You're coming to The Board of

3   Parole specifically us here today asking us to

4   release you on parole. It seems to me that

5   substance abuse treatment would be very

6   important for you as an ongoing prior to. Do

7   you have anything to say about why you're not

8   currently participating in some kind of

9   substance abuse treatment, and I don't care if

10  it's NA or AA (indiscernible) but something?

11       INMATE COTE: I go to school at night

12  every night. I go to work every day all day

13  long and when I get home by the time, time

14  clears to go to chow and then I go to school

15  every night. I don't get out until about

16  between 8:10, 8:15, 8:30.

17       DEPUTY COMMISSIONER SULLIVAN: So

18  what's your plan for remaining drug and alcohol

19  free?

20       INMATE COTE: I'd stay with my

21  religion. It prohibits me from doing anything,

22  keeping with that program. My school means more

23  to me right now than anything. I haven't had it

24  when I was a kid. I'm kind of liking what I'm

25  getting -- what I'm getting out from school and

26  that takes a lot of time from me.

27       DEPUTY COMMISSIONER SULLIVAN: Sir,

45

1   you're talked about your religion a couple of

2   times and that's great.  I commend you for

3   finding a group of people that helps you with a

4   foundation and a good moral conduct.  Before you

5   came to prison did you no the difference between

6   right and wrong?

7           INMATE COTE:  Yeah.

8           DEPUTY COMMISSIONER SULLIVAN:  Did you

9   know that using drugs was a right and wrong, was

10  wrong?

11          INMATE COTE:  Yes, I did.

12          DEPUTY COMMISSIONER SULLIVAN:  So how

13  is that a substance abuse program?

14          INMATE COTE:  Well, I didn't have --

15          DEPUTY COMMISSIONER SULLIVAN:  It's not

16  that I don't respect your religion, I absolutely

17  do.  It's that I don't understand how that's

18  going to give you the coping skills to stay off

19  drugs and alcohol (indiscernible)?

20          INMATE COTE:  Well, it's pretty easy,

21  you know, and right now I seem to be doing

22  rather a good job staying off of it staying away

23  from them.  I mean, some of these officers in

24  this room can tell you, I mean, drugs on the

25  yard are pretty plentiful.

26          DEPUTY COMMISSIONER SULLIVAN:  I'm

27  aware of that.

46

1 INMATE COTE:  And it's very easy to get

2 them if I choose so but I don't.

3 DEPUTY COMMISSIONER SULLIVAN:  Okay.

4 On a more positive note I want to commend you

5 for receiving your GED in May of '05, sir --

6 INMATE COTE:  You mean 10th?

7 DEPUTY COMMISSIONER SULLIVAN:  May 10,

8 of '05 to be specific.  I seriously commend you

9 for doing that and I'm sure it took a lot of

10 work.  It took a long time for you to decide to

11 do it and put the effort into doing it, so I

12 want that to be recognized fully here today that

13 you -- that is a very -- that is a very

14 commendable accomplishment on your part.  You

15 also were involved in the tutoring project for

16 REACH and still --

17 INMATE COTE:  Still.

18 DEPUTY COMMISSIONER SULLIVAN:  Sir, I'm

19 going to give you credit and if I don't I'm

20 going to give you a chance to tell me all about

21 it but you're going to have to let me finish my

22 sentences because otherwise we're going to have

23 a long afternoon.  Okay?

24 INMATE COTE:  No problem.

25 DEPUTY COMMISSIONER SULLIVAN:  Sir,

26 tell me about the tutor.  I actually think that

27 that's fantastic seeing you give your gift of

47

1   education to someone else so tell me all about

2   it.

3        **INMATE COTE:**  That's what I was telling

4   them exactly almost when I got my GED that asked

5   if what am I going to do once I get my GED.

6   June Fessor (phonetic) to be exact was one of

7   the ladies who was asking me what I wanted to do

8   I said well you gays gave me an education so I

9   want to put back into the GED program and

10  Project REACH that they have here.  I want to

11  help them guys maybe get their GEDs put them on

12  the right road.  Once -- they've accepted me as

13  a tutor but now we have classes we have to go to

14  all day long.  My last one is next week -- or

15  excuse me, tomorrow to be a good tutor.  When I

16  became -- just prior to that when I went to get

17  my GED, I was valedictorian.  I have the

18  valedictorian speech right here.  I was very

19  proud of that.  That's the biggest reason why

20  I'm in school.

21       **DEPUTY COMMISSIONER SULLIVAN:**  Good for

22  you, sir.  I see that you also took a course --

23  actually twice you took Math 50 from Patterson -

24  - I'm sorry Patton College.

25       **INMATE COTE:**  I still am.

26       **DEPUTY COMMISSIONER SULLIVAN:**  All

27  right.  In terms of vocation, you were in the

48

1  carpenter shop in '95 and then if I understand

2  you were transferred before you completed the

3  program.  You have a certificate of provision

4  from December 13, '04 for (indiscernible) you

5  also are in the welding program and you get very

6  high marks ones and two's, which mean

7  exceptional and above average, and the last

8  evaluation that is in the C File is from January

9  of '05 and that evaluation says that you are a

10  skilled sewing machine operator, which is very

11  good.  Additionally, you are on the PIA safety

12  committee as of January of this year?

13       INMATE COTE:  Yes, ma'am.

14       DEPUTY COMMISSIONER SULLIVAN:  And you

15  were commended for your participation in that.

16  It's very good.  Is there anything that -- oh,

17  I'm sorry, you also participated in the workshop

18  recreational skills training.  I see four

19  different workshops that you attended in '05 in

20  that regard?

21       INMATE COTE:  Yes, ma'am.

22       DEPUTY COMMISSIONER SULLIVAN:  Is there

23  any I should and Commissioner Lee should know

24  about your vocational or educational training

25  that I didn't cover?

26       INMATE COTE:  Well, I am a certified

27  welder because of that welding class.

49

1    **DEPUTY COMMISSIONER SULLIVAN:**  Very

2   good.  Additionally in the past you have been --

3   in the early '80s you have been in stress

4   management, anger management in the late '80s.

5   It liked like you were in a lot of therapy

6   groups during the '80s, and recently you took

7   the FEMA courses.  A lot of the FEMA they're

8   educational, but I don't know how effective they

9   are, but there are several that are very

10   practical regardless of your situation and the

11   ones that you took are the one to bring out in

12   order  (indiscernible} problem solving course as

13   well as effective communication.  There was a

14   psychological report done for this hearing, it

15   was done by Mr. Wagner PhD, W-A-G-N-E-R,

16   actually the report has already been stated and

17   discussed already was not done for this hearing

18   but was done in 1999.  It was discussed at your

19   last hearing and I have reviewed it as well.  I

20   am going to be referring to page four where the

21   psychologist gives a diagnostic impression based

22   on the DSM4, diagnosis criteria.  He says under

23   Axis I, poly substance in remission, Axis II,

24   antisocial personality disorder; improving with

25   age, and under the global assessment of

26   functioning he gives you a score of 75.  On the

27   bottom of page -- under assessment of

1  dangerousness he says:

2      Mr. Cote hopes to be released

3      and live with his mother in

4      Southern, California.  His level

5      of dangerousness at the time of

6      the instance offense was

7      unpredictable.  He had training

8      in marshal arts and in a serious

9      substance abuse program.  In the

10     years since that time he has

11     continued on occasion to resort

12     to violence within the prison to

13     defend himself.  If parole were

14     to be granted, absolute absence

15     from any substance abuse would

16     be mandatory.

17  On page five under recommendations it says that:

18     You've matured over time.  The

19     prison has been an informative

20     experience in all of his adult

21     years now having lived together

22     within prison -- sorry, now --

23     sorry, strike that, having now

24     lived longer within prison than

25     he did before the crime, there

26     seems to be a relationship

27     between the probable time of

51

1    molest and physical abuse at the

2    hands of his father and the

3    onset of his serious substance

4    abuse and (indiscernible) for

5    fighting.  This does not explain

6    his behavior on the night of the

7    crime but it may be key to his

8    maintains sobriety and self-

9    control in the future.  If

10    additional therapy could be made

11    available to him he could

12    further resolve of the conflicts

13    that drugs meant as a youth.  If

14    he is able to maintain sobriety

15    and remain free of fighting

16    within the institution, he will

17    have a chance at successful

18    parole in the future.  The gains

19    made in behavior control are

20    recent and need further

21    establishment before a confident

22    assessment can be made about

23    changed behavior in the future.

24    It does appear however to be

25    making gains in the area of

26    responsibility and self-control.

27  Do you have any comment on the doctor's report?

52

1   No?  Is there anything that you would like to

2   clarify or add for consideration regarding the

3   things you've done since you've been

4   institutionalized?

5           INMATE COTE:  I've done a lot of work

6   and when you asked me -- I guess your question

7   was because of my religion how can that help me

8   and my education that takes a lot of time, it's

9   work --

10          DEPUTY COMMISSIONER SULLIVAN:  Sir, I

11  actually wasn't asking you how it could help

12  you, what I was asking you -- I was trying to

13  point out that I didn't see that the religion

14  itself having a substance abuse treatment and

15  that your past -- the past is the best

16  prediction of the future so your past indicates

17  that you got a serious substance abuse problem

18  and I was interested in --

19          INMATE COTE:  I'm a changed individual.

20          DEPUTY COMMISSIONER SULLIVAN:  Okay.

21          INMATE COTE:  A very changed

22  individual.

23          DEPUTY COMMISSIONER SULLIVAN:  All

24  right.  Okay.  Is there anything else?

25          INMATE COTE:  No.

26          DEPUTY COMMISSIONER SULLIVAN:  Would

27  you like to add or clarify anything else into

53

1   the record regarding his incarceration?

2         ATTORNEY HOFFMANN:  I will just note

3   that as indicated previously he has done

4   (indiscernible) self-help and therapy a lot of

5   that related directly to his substance abuse

6   history, which is admittedly significant and

7   part of his religion is abstinence from drugs

8   and alcohol whether we trust that he will --

9   whether you trust that he is going to continue

10  to abide by that is a different story.  I think

11  he's -- my understanding in this potion is that

12  he has done the substance abuse treatment that

13  was needed and is now using those goals as well

14  as his religion to ensure that he is sober for

15  the remainder of his life.

16        DEPUTY COMMISSIONER SULLIVAN:  Thank

17  you.  I'll return to the chair.

18        PRESIDING COMMISSIONER LEE:  All right.

19  Sir, you indicated earlier that alcohol and

20  drugs don't nix.  Would you agree that your

21  staying alcohol and drug free is important to

22  your success out on the streets?

23        INMATE COTE:  It would be a mandatory.

24        PRESIDING COMMISSIONER LEE:  All right.

25  Unfortunately it appears that you had some

26  problems trying to stay alcohol free while in

27  prison; is that correct?

54

1       INMATE COTE:  I haven't been drunk in a

2  very, very, very long time.

3       PRESIDING COMMISSIONER LEE:  I didn't

4  say drunk.

5       INMATE COTE:  I haven't needed it in a

6  very long time.

7       PRESIDING COMMISSIONER LEE:  What

8  happened in May of 2001?

9       INMATE COTE:  My celli was trying to do

10  a favor for somebody by holding their wine, You

11  see he -- You know, I had went to work that day.

12  I guess they were getting ready to do cell

13  searches for surgeon individuals in our block so

14  he wanted to be the good homeboy and help a

15  friend out so he takes it from their house and

16  puts it in our house.  Well, the officer in the

17  tower seen that.  They tell him to step out and

18  they searched the house and they find what

19  appears to be two-and-a-half gallons of wine in

20  the cell.  Lieutenant Forest told the man, my

21  celli, you're not going to get in no trouble

22  just admit that it's yours and we'll get on with

23  the next day if not you're both going to get in

24  trouble.  Well, since he was a kid he thought no

25  I'm not going to admit to nothing they find us

26  both guilty.

27       PRESIDING COMMISSIONER LEE:  Both of

55

1  you guys were (indiscernible)?

2        INMATE COTE:  Yes, sir.

3        PRESIDING COMMISSIONER LEE:  So you're

4  saying that wasn't your alcohol?

5        INMATE COTE:  No.

6        PRESIDING COMMISSIONER LEE:  How come

7  you have so many 115s?

8        INMATE COTE:  Getting used to prison.

9  I guess I was just trying to be a -- I don't

10  know how to explain it.  That first initial

11  adjustment period was kind of rough.

12        PRESIDING COMMISSIONER LEE:  Well, that

13  might have been able to understand in '79 '80 or

14  '81, or '83 '84 '85, '87.  You got -- I have --

15  this is the '90s.  I'm only doing the '90s.  All

16  right.  Physical altercation in '92, physical

17  altercation in '95, hoping that I don't know

18  that not only did you have a degree in judo,

19  but you also have -- you were also involved in

20  other martial arts.  You've never had to carry a

21  weapon because for most of your life you've been

22  able to handle yourself.  Am I misstating that

23  fact?

24        INMATE COTE:  No.

25        PRESIDING COMMISSIONER LEE:  All right.

26  So basically you're getting into fights.  I'm

27  assuming you're winning these fights and then in

1  1995 you are involved with a group that was

2  pressuring other inmates, in October of '95 the

3  same thing, '96 same thing, '97 same thing --

4           INMATE COTE:  Can I --

5           PRESIDING COMMISSIONER LEE:  Go ahead.

6           INMATE COTE:  Can I elaborate on that?

7           PRESIDING COMMISSIONER LEE:  Yes,

8  absolutely.

9           INMATE COTE:  I can say that I did one

10  of those, however --

11           PRESIDING COMMISSIONER LEE:  What it

12  sounds like is that you're a muscle for the

13  Arian Brotherhood that's what it sounds like.

14           INMATE COTE:  I used to hang around a

15  lot of bad people and I hung around a lot of bad

16  people I'll put it like that and things were

17  going down.  Things were being said to other

18  individuals and I guess there were some pretty

19  foul things being said to some people, and one

20  guy in particular I was not pretty much all of

21  them went and let the staff know on all of us so

22  they had to do their thing and come and break

23  all of us up.  I was placed in the hole behind

24  that.

25           PRESIDING COMMISSIONER LEE:  There was

26  one, two, three, four, four since '95.  Know one

27  suspects, Mr. Cote, you're an intelligent man

57

1   meaning that you couldn't figure out after the

2   first 115 maybe I shouldn't be hanging around

3   because I'm getting blamed for stuff I didn't do

4   because basically what you're telling me is that

5   as you hang around with these individuals

6   somehow they infer that you pressure other

7   individuals one because of your size, two

8   because who you hang around with, and obviously

9   your reputation and you couldn't figure out --

10  you're telling me that you weren't smart enough

11  to quit hanging around with individuals that

12  were getting you in add seg or getting you the

13  115s?

14        INMATE COTE:  I've stopped hanging

15  around with that group of individuals but there

16  were another group of individuals it's an

17  ongoing thing.  I mean it's an everyday thing

18  around here.  It's hard to stay away from a lot

19  of that stuff.

20        PRESIDING COMMISSIONER LEE:  The whites

21  in prison are generally very concerned because

22  they are outnumbered greatly by various other

23  groups, is that safe to say?

24        INMATE COTE:  To a lesser degree, yes.

25        PRESIDING COMMISSIONER LEE:  All right.

26  And they don't -- certainly these groups don't

27  allow very many people in their association; is

58

1  that correct?

2          INMATE COTE:  Not anymore pretty much

3  everybody's --

4          PRESIDING COMMISSIONER LEE:  Let's just

5  say think some of the people that you know don't

6  associate with blacks or Hispanics is that safe

7  to say?

8          INMATE COTE:  Yes, sir.

9          PRESIDING COMMISSIONER LEE:  All right.

10  So you're pretty tight with these people if they

11  let you associate with them, correct?

12          INMATE COTE:  I associate with

13  everybody, nobodies -- I know what you're saying

14  but --

15          PRESIDING COMMISSIONER LEE:  What I'm

16  saying is, is that you're very tight with these

17  people because they don't allow anyone to hang

18  around with them?

19          INMATE COTE:  Correct.

20          PRESIDING COMMISSIONER LEE:  Are you

21  still hanging around with these people?

22          INMATE COTE:  No.

23          PRESIDING COMMISSIONER LEE:  When did

24  you stop?

25          INMATE COTE:  Since I came here.

26          PRESIDING COMMISSIONER LEE:  Since

27  you've been in Sacramento?

59

1      INMATE COTE:  Yes, sir.

2      PRESIDING COMMISSIONER LEE:  Okay, when

3  was that?

4      INMATE COTE:  June 17, 2003.

5      PRESIDING COMMISSIONER LEE:

6  (indiscernible) you cannot tell me that you were

7  not hanging with people so close without their

8  permission.  They are very selective who they

9  allow in.  All right.  At this point in time,

10  Deputy Commissioner, do you have any questions?

11      DEPUTY COMMISSIONER SULLIVAN:  I do.  I

12  have a question about the commitment offence.

13  Sir, you said today that the rape part of this

14  crime did not happen?

15      INMATE COTE:  Yes, ma'am.

16      DEPUTY COMMISSIONER SULLIVAN:  The

17  probation officer's report indicates that the

18  police were called initially because the person

19  observed what he leaved to be a rape, number

20  one, number two; her body was found nude, number

21  three; there were teeth marks on her shoulder

22  and breast, can you explain that?

23      INMATE COTE:  I have no teeth right up

24  here.  One --

25      DEPUTY COMMISSIONER SULLIVAN:  No, no,

26  no, no, let's back up.  I want you to explain

27  how you can tell us today that you didn't rape

1  her when all the evidence indicates that you

2  did?

3      INMATE COTE:  I'm telling you I didn't.

4  The night that this happened I was on heroin.  I

5  was on alcohol.  I had some pills.

6      DEPUTY COMMISSIONER SULLIVAN:  But do

7  you remember taking her clothes off?

8      INMATE COTE:  No, I didn't take nothing

9  off of her.

10      DEPUTY COMMISSIONER SULLIVAN:  Okay,

11  and you also said you don't really remember the

12  events, so do you remember or do you not

13  remember?

14      INMATE COTE:  I'm telling you I

15  remember do I do remember.  I'm trying to tell

16  you, it was no rape going down.  Nothing

17  happened like that.  I was unable to --

18      DEPUTY COMMISSIONER SULLIVAN:  I

19  understand the effects of heroin.  Did you

20  sexual assault her whether or not --

21      INMATE COTE:  No.

22      DEPUTY COMMISSIONER SULLIVAN:  Okay.

23  Do you understand that can mean more than

24  actually having sexual intercourse with her?

25      INMATE COTE:  Yes, ma'am.

26      DEPUTY COMMISSIONER SULLIVAN:  Okay.

27  Do you have any explanation for the evidence in