# EXHIBIT D
# Part 3 of 3

1    this case being contradictory to what you're

2    saying today?

3         INMATE COTE:  Being that they got that

4    from a witness, I guess it was at 10:20 at

5    night, saying that he was there -- I don't know

6    what to tell him that didn't happen.  I guess it

7    was the coroner's report who testified to that

8    as well.

9         DEPUTY COMMISSIONER SULLIVAN:  Again I

10   would tell you there's a difference between a

11   sexual assault and sexual intercourse but I

12   think you've answered my question adequately.  I

13   have nothing else.

14        PRESIDING COMMISSIONER LEE:  Thank you.

15   At this point in time we will go into parole

16   plans.  The inmate indicates that he wishes to

17   reside with his mother in Riverside, California

18   and until he becomes financially secure enough

19   to move out on his own.  The inmate indicates he

20   is a certified welder and will seek employment

21   in the field as soon as he is granted parole.

22   Inmate has contacted the EED in Riverside to

23   inquire about housing as well as employment

24   opportunities.  Now, I heard counsel indicate

25   that you submitted some documents.

26        ATTORNEY HOFFMANN:  I only have the

27   letters that were provided to me earlier one

62

1    from his sister, who works right here in

2    Riverside County Mental health and this letter

3    indicates that she is willing to support him as

4    much as she can as well as his mother

5    (indiscernible).

6            PRESIDING COMMISSIONER LEE:  Did you

7    submit this to us because I don't have a copy?

8            ATTORNEY HOFFMANN:  I haven't because

9    they were provided to me.

10           PRESIDING COMMISSIONER LEE:  Okay.

11   Well, next time let's make copies.

12           ATTORNEY HOFFMANN:  I assumed that they

13   were in the packet --

14           PRESIDING COMMISSIONER LEE:  All right.

15           ATTORNEY HOFFMANN:  -- that everyone

16   got but there's this additional letters as well

17   from his niece.

18           PRESIDING COMMISSIONER LEE:  Okay.

19   This letter is not dated however it is from

20   Dorris (indiscernible) it indicates:

21           I'm hoping you could let Bobby

22           out (indiscernible) I want to

23           see my son.  I see my other kids

24           my two girls and one boy and

25           that's why I want to see my son

26           as soon as (indiscernible) I

27           miss my son very much and want

63

1        to see him right here.  I'm

2        hoping you release him soon.

3  Signed Ms. Cote.  Sir, do you have any contact

4  with siblings your brothers or sisters?

5        INMATE COTE:  I write a letter to my

6  mom and she lets everybody read it because I

7  don't have their addresses.

8        PRESIDING COMMISSIONER LEE:  Okay.  Do

9  they come visit?

10       INMATE COTE:  It's pretty far away.

11       PRESIDING COMMISSIONER LEE:  Where?

12       INMATE COTE:  In Riverside, California.

13       PRESIDING COMMISSIONER LEE:  No bodies

14  ever came to visit you here?

15       INMATE COTE:  No.  I've got a couple of

16  visits at Ironwood down there.

17       PRESIDING COMMISSIONER LEE:  Okay.  All

18  right.  The next letter dated February 7, 2006:

19       My name is Linda Taylor.  I am

20       the sister of inmate.  I've seen

21       him a couple of times in prison

22       and he was (indiscernible) and I

23       have serious doubts about

24       whether he really wanted to get

25       out of prison.  He has always

26       had trouble.  I seen a video of

27       his GED graduation ceremony and

1   Every time I drive by the area
2   of where the crime took place, I
3   think about the situation of the
4   (indiscernible) victim and I
5   can't help feeling sorry
6   (indiscernible) the victim lost
7   her life and the family lost a
8   mother daughter, wife, sister
9   (indiscernible).  I've seen many
10  things happen to my brother and
11  my father was extremely abuse I
12  to him as well as the rest of
13  the family.  My mother and
14  sister went through a lot of
15  abuse and I feel that my family
16  lost (indiscernible).  Do I
17  support the inmate upon release,
18  yes.  He has support from his
19  family (indiscernible).  I work
20  at Riverside mental health and
21  what we do to our clients
22  (indiscernible).  I want my
23  brother to come home.  He has
24  made great progress.  I know in
25  my heart that my family and I am
26  extremely proud of him and his
27  future success.  As I said, I

65

1    support his release and I will

2    do all within my power to

3    support him (indiscernible)

4    Where does your sister live?

5    INMATE COTE:  In Riverside I think it's

6    the next apartment next door to my mother.

7    PRESIDING COMMISSIONER LEE:  Okay.

8    Next time you make sure that they have

9    addresses.  It's very difficult to understand

10   what your parole plans are (indiscernible).

11   Nonetheless, the last two support letters I have

12   (indiscernible) I have another letter this is

13   dated February 2, 2006.

14   I name is (indiscernible) I am

15   the niece of the inmate I met

16   him only once.  I'm 12 years

17   old.  I would love to

18   (indiscernible) I was so proud

19   of him I would like to see him

20   get out and get a job

21   (indiscernible) and I would love

22   to have my uncle Robert be at my

23   wedding.  (indiscernible)

24   How old is your niece?

25   INMATE COTE:  I don't know 17, 15

26   maybe.

27   PRESIDING COMMISSIONER LEE:  And.  Okay

1  and I would suspect that this is from one of

2  your sisters.

3          INMATE COTE:  I think.

4          PRESIDING COMMISSIONER LEE:  That's

5  your niece and the last name is (indiscernible)

6  so I'm trying to figure out (indiscernible)

7          INMATE COTE:  I don't know most of the

8  people that you have there.  I can only say that

9  I don't know which sister.

10         PRESIDING COMMISSIONER LEE:  But it is

11  one of your sisters?

12         INMATE COTE:  Yes.

13         PRESIDING COMMISSIONER LEE:  Yeah,

14  that's what I thought.  That's what I said.  I

15  didn't think it was one of your brothers.  Any

16  way, all right having said that, Counsel, are

17  there any other documents you wish to submit to

18  us at this time in regards to parole plans?

19         ATTORNEY HOFFMANN:  No.

20         PRESIDING COMMISSIONER LEE:  Okay.  We

21  sent out 3042 they are notices that are sent out

22  to various individuals and organizations that

23  have a special interest in the case.  In this

24  regard we do have a response from the district

25  attorney's office as well as we have the

26  victim's next of kin.  At this point in time I

27  will turn it over to Ms. Dunn unless the deputy

1    commissioner has any more questions?

2           DEPUTY COMMISSIONER SULLIVAN:    I do

3    not.  Thank you.

4           PRESIDING COMMISSIONER LEE:    All right.

5    Ms. Dunn, do you have any questions of the

6    inmate?

7           DEPUTY DISTRICT ATTORNEY DUNN:    Yes, I

8    do.  Thank you.  Commissioner, I would like to

9    ask the inmate if recalls exactly in what manner

10   he ran away from the woman when he escaped after

11   the crime?

12          PRESIDING COMMISSIONER LEE:    You may

13   answer?

14          INMATE COTE:    I remember getting up and

15   turning to my left and running into a fence,

16   hurdling a fence, maybe getting up on the roof

17   or something, jumping down and walking to what

18   appeared to be somebody's driveway leading out

19   to the main street.

20          DEPUTY DISTRICT ATTORNEY DUNN:    But I

21   would like to ask the inmate he recalls when he

22   left the body of Ms. McCarthy if he recalls that

23   her legs were spread apart and bent at the knees

24   lightly, does he recall that position?

25          INMATE COTE:    No.

26          DEPUTY DISTRICT ATTORNEY DUNN:    I would

27   like to ask the inmate why he wrapped the

68

1  victim's blouse around her neck?

2          INMATE COTE:  I did not do that.

3          DEPUTY DISTRICT ATTORNEY DUNN:  I would

4  like to ask the inmate how his brown belt with

5  his name inscribed on it was found at the feet

6  of the body of Ms. McCarthy?

7          INMATE COTE:  I don't know, that I

8  don't know.

9          DEPUTY DISTRICT ATTORNEY DUNN:  I would

10 like to ask the inmate, if he can explain why a

11 bite mark was found near the left nipple of the

12 victim, Ms. McCarthy, according to the police

13 reports?

14         INMATE COTE:  I don't know why that.

15         DEPUTY DISTRICT ATTORNEY DUNN:  I would

16 like to ask the inmate whether Ms. McCarthy

17 struggled and screamed as he was beating her?

18         INMATE COTE:  No.

19         DEPUTY DISTRICT ATTORNEY DUNN:  I would

20 like to ask the inmate if recalls kicking the

21 victim in the face with his boots on the night

22 of the murder?

23         INMATE COTE:  No, I didn't.

24         DEPUTY DISTRICT ATTORNEY DUNN:  And

25 finally I would like to ask the inmate why he

26 made up a story of the time of the crime about

27 being jumped by two people with knives?  What

69

1   was his thinking in making up such a story?

2        INMATE COTE:  I was afraid.  I was

3   afraid of police -- I was afraid of everything.

4   I was afraid that -- I can't explain it.  Let's

5   just say I was afraid of everything that night.

6        DEPUTY DISTRICT ATTORNEY DUNN:  One

7   more question, Commissioner; when the inmate

8   left the woman of the night of the crime, does

9   he recall whether she was still alive or dead at

10  that point?

11       INMATE COTE:  I don't remember, sir.

12       DEPUTY DISTRICT ATTORNEY DUNN:  I don't

13  have anymore question.  Thank you.

14       PRESIDING COMMISSIONER LEE:  Counsel,

15  do you have any questions of your client?

16       INMATE COTE:  I do have questions.  Can

17  you just describe for me briefly what types of

18  changes you invested in yourself since arriving

19  at San Quentin?

20       INMATE COTE:  From San Quentin I was

21  still a little bit mad at everybody specifically

22  correctional officers, though they had nothing

23  to do with me getting put in here, it just

24  seemed like -- it seemed like their job was to

25  make it a little easier.  What I mean by that is

26  if we were out in the yard playing doing

27  whatever some kind of sport event we all know

70

1  what the rat system is in here.  They might go

2  up to them and explain something to them or get

3  somebody in trouble that would make me mad.  It

4  would infuriate me.  Case in point, a man

5  decided he didn't want to stay in the hole -- I

6  mean he didn't want to stay in the yard any

7  longer.  He wanted to go to the hole to be with

8  his friends so he made up some fictitious story

9  to correctional officers to get off the yard

10  indicating that several people were trying to

11  attack him, which never happened.

12          DEPUTY COMMISSIONER SULLIVAN:  So I'm

13  going to stop and maybe just clarify a little

14  bit in the question.  Are there things about San

15  Quentin particularly that are different from

16  other institutions that you're been in

17  previously?

18          INMATE COTE:  I lot of penitentiaries

19  don't have no programs.

20          ATTORNEY HOFFMANN:  So what has that

21  done for you?

22          INMATE COTE:  It's enabled me to get in

23  these programs to stay clean.  I never liked

24  school; now I love school.  I'm getting all

25  these Chronos indicating what kind of work we're

26  doing and all this stuff, correction officers,

27  staff all this -- it's been pretty beneficial to

71

1   me.

2        ATTORNEY HOFFMANN:   Okay.  And when you

3   mentioned to me earlier today that you had some

4   additional help from (indiscernible) and

5   certificates and things that you were able to

6   receive (indiscernible)

7        INMATE COTE:   Tomorrow.

8        ATTORNEY HOFFMANN:   What is that

9   program?

10       INMATE COTE:   San Quentin -- excuse me,

11  San Quentin's got a program here its called

12  Project REACH.   It's much like the GED classes

13  they have here.

14       ATTORNEY HOFFMANN:   So (indiscernible)

15       INMATE COTE:   Right.

16       ATTORNEY HOFFMANN:   The one deputy

17  commissioner focused on?

18       INMATE COTE:   It's tomorrow right.

19  They put you up and give you a grueling test and

20  when you get done they give you a certificate

21  for it.

22       ATTORNEY HOFFMANN:   Okay.

23       INMATE COTE:   For a tutor.

24       ATTORNEY HOFFMANN:   I also know this

25  from your previous board reports that in 2006 is

26  the first year that you chose to be forthcoming

27  or really discuss your crime and I want to know

72

1   why you thought that was -- or you were prepared

2   to do that or what changed for you that you

3   wanted to do that?

4       INMATE COTE:  I wanted to try to -- I

5   wanted to try to apologize to the man -- to the

6   victim's family.  I wanted to try to make some

7   kind of amends that's all.  It's hard to be --

8       ATTORNEY HOFFMANN:  So a lot of people

9   would probably wonder why it took you so long?

10  What changed for you where you have been

11  suddenly, after almost 30 years, you were ready

12  to apologize?

13      INMATE COTE:  Maybe I'm getting old.

14  Maybe maturity has set in, I don't know, but I

15  do believe at this time they heard it.

16      ATTORNEY HOFFMANN:  Okay and why have

17  you chose not to talk about it before?

18      INMATE COTE:  I really don't know.  I

19  really don't know.  I couldn't even answer that

20  question.

21      ATTORNEY HOFFMANN:  I think that's all.

22      PRESIDING COMMISSIONER LEE:  All right.

23  We have completed the --

24      DEPUTY COMMISSIONER SULLIVAN:  My

25  suggestion is that we take a minute and turn it

26  over so that we don't cut anybody off during

27  their statements.

1        PRESIDING COMMISSIONER LEE:  Very good.

2        DEPUTY COMMISSIONER SULLIVAN:  I'm

3  going to go off the record for a minute.

4               (off the record)

5        DEPUTY COMMISSIONER SULLIVAN:  We are

6  back on the record in the parole suitability

7  matter for Mr. Cote; this is side two.

8        PRESIDING COMMISSIONER LEE:  We have

9  reached the questioning aspect for the portion

10  of the parole hearing.  We have gone through the

11  inmate's previous situation with his social

12  history, facts of juvenile record, facts of the

13  case as well as currently his programming and

14  his psychological report, we covered parole

15  plans, as well as letters of support, as well as

16  opposition.  At this point in time, Counsels,

17  are there anything else that needs to be

18  submitted at this point in time?

19        ATTORNEY HOFFMANN:  I didn't mention it

20  previously because they're adjusted in letters

21  about parole plans specifically but I just want

22  to make sure that you have these letters, which

23  there's three were (indiscernible) in my file

24  (indiscernible)

25        PRESIDING COMMISSIONER LEE:  These are

26  letters?

27        ATTORNEY HOFFMANN:  From

74

1   (indiscernible).

2       **PRESIDING COMMISSIONER LEE:**   I will

3   note that there is a letter here from the PIA in

4   2006 (indiscernible).

5       **DEPUTY COMMISSIONER SULLIVAN:**   I got

6   the letter and frankly I thought I covered it.

7   I mean, I may not have specifically referred to

8   those letters --

9       **ATTORNEY HOFFMANN:**   Okay.

10      **DEPUTY COMMISSIONER SULLIVAN:**   -- but I

11  tried to indicate that he had many different

12  skills under the areas of his skill and that he

13  has skills in --

14      **ATTORNEY HOFFMANN:**   Okay.  It is

15  significant and I (indiscernible) that someone

16  would take the time to write it out so I just

17  wanted to make sure that it was, you know, there

18  was various letters from present staff.

19      **PRESIDING COMMISSIONER LEE:**   I'm more

20  concerned about the next letter but I will read

21  it into the record.  It's March 17, 2006 report

22  from (indiscernible) H-E-S-L-E-R:

23          Inmate Cote has conducted

24          himself in a manner which

25          (indiscernible) because he is a

26          person of such determination he

27          was chosen by the class as class

75

1            valedictorian.  In that role he

2            delivered a clear and inspiring

3            message and the inmate has not

4            (indiscernible) but rather has

5            become a tutor as well as

6            (indiscernible).

7 All right, so I think at this point in time we

8 have all documents that counsel wishes to

9 submit.  The district attorney has nothing

10 further.  We are at the stage of statements.  I

11 will hear from the representative of the

12 District Attorney's Office.

13      **DEPUTY DISTRICT ATTORNEY DUNN:**  Thank

14 you.  It's the position that the District

15 Attorney's Office today that Mr. Cote is

16 unsuitable for parole and we request in his case

17 a lengthy denial of parole.  The crime alone in

18 this case justifies the denial of parole.  It is

19 clear that the concern for public safety

20 overrides any expectancy that an inmate may have

21 in a term of (indiscernible) equality with that

22 of other inmates with similar crimes.  The

23 gravity of the offense indicates that he is a

24 continue danger to the public.  The

25 circumstances of this crime are well beyond

26 those that are necessary to establish the

27 minimum elements of the crime.  It was an

76

1    exceptionally callous, cruel, brutal, and

2    sadistic crime.  Without going into to many

3    gruesome details, I would like to highlight one

4    or two things.  In the police report prepared

5    September the 19, 1976 by Deputy Bales, B-A-L-E-

6    S, from the Riverside County Sheriff Department:

7            He was present during the

8            autopsy of victim Rose McCarthy.

9            And during the examination by

10           Dr. Fobes, F-O-B-E-S, the doctor

11           was shown the boots of suspect

12           Cote and asked if these could

13           cause the fractures and

14           lacerations to the face of the

15           victim and he said yes and that

16           this will do it rather than

17           human fists.  There was

18           lacerations found above her

19           eyebrows, between her eyes, on

20           the bridge of her knows, at the

21           base of ears.  Her eyes her

22           bruised and discolored.  There

23           were teeth marks found on her

24           left nipple and the top of her

25           right shoulder area.  There were

26           bruises on her groin, and her

27           eyes were discolored.  She

77

1          choked to death on her own

2          blood.

3     It is clear that the inmate that day committed

4     an extraordinarily brutal sadistic, and one

5     might even say, animalistic crime when he sexual

6     and then murdered Rose McCarthy, a woman who he

7     did not know, and for him to sit here today and

8     claim somebody came up from behind me and hit me

9     and it was a blur defies belief.  Obviously he

10    knew what was going on to the point where he was

11    anal to run away and climb up a roof and jump

12    down into a parking lot and run to get the heck

13    out of there, so he wasn't that out of it, he

14    just can't face it.  In addition to his lack of

15    the insight and remorse for this extraordinarily

16    brutal crime this man with his significant use

17    of substance abuse, has no relapse prevention

18    plan or known solid parole plans that would help

19    this kind of offense in the future.  He has have

20    very serious and extensive disciplinary record,

21    the possession of Pruno in May 2001, for which

22    he gives us the further ridiculous excuse, it

23    was my celli hiding for somebody else.  It's

24    like the defense that you get all the time yes,

25    there's meth in those pants but those aren't my

26    pants.  We hear this kind of thing a lot and

27    it's not believe, and this was less than a year

78

1  after he was admonished by Commissioner Nunios

2  (phonetic) in the 2000 board hearing to remain

3  disciplinary free.  He did not do it.  He has

4  made some gains and it's good that he god his

5  GED, however, any gains that this man has made

6  are very trivial in comparison with his crime

7  and with his extensive disciplinary record, and

8  his complete lack of insight and remorse.  He

9  has been diagnosed in the past with an

10  antisocial personality disorder, and I would

11  submit to parole this man at this time would

12  place at least 50 percent of the population of

13  the State of California and 50 percent, which

14  are female, in danger.  Thank you.

15          PRESIDING COMMISSIONER LEE:  And it's

16  time for your comments, Counsel.

17          ATTORNEY HOFFMANN:  So I will begin

18  with the recognition that we had some struggles

19  this morning whether or not we were going to go

20  forward with this case based on the fact that

21  the psych evaluation was old and dated 1999.  I

22  know that deputy commissioner Sullivan has read

23  a good amount of that evaluation into the

24  record, I just want to take special note of the

25  fact that while it's not entirely positive, Dr.

26  Wagner does indicate that the absence from

27  substance abuse is a necessary part of his

79

1  parole condition and that's something that Mr.

2  Cote is happy to abide by, as well as the fact

3  that he, Mr. Cote, will have a successful chance

4  of parole in the future if he is able to

5  maintain the gains that were in 1999 recent.

6         PRESIDING COMMISSIONER LEE:  Hold on.

7  Did we lose something?

8         DEPUTY COMMISSIONER SULLIVAN:  It looks

9  as if we lost contact with our --

10        DEPUTY DISTRICT ATTORNEY DUNN:  We're

11 here.

12        PRESIDING COMMISSIONER LEE:  Okay.  Can

13 you see us?

14        DEPUTY DISTRICT ATTORNEY DUNN:  We do

15 see and hear you.  Can you see us?

16        DEPUTY COMMISSIONER SULLIVAN:  No.

17        PRESIDING COMMISSIONER LEE:  But that's

18 all right as long as you can see us; that's more

19 important.  I will -- hold on just a second let

20 me see this.

21        PRESIDING COMMISSIONER LEE:  I'm going

22 to allow Mr. Montgomery to attempt to get the

23 picture back.  At least let us know if you lose

24 picture at any point in time.

25        DEPUTY DISTRICT ATTORNEY DUNN:  No

26 problem.

27        PRESIDING COMMISSIONER LEE:  Thank you.

80

1    All right, finish Counsel.

2          **ATTORNEY HOFFMANN:**  We're back on?

3          **DEPUTY COMMISSIONER SULLIVAN:**  We're

4    back on.

5          **ATTORNEY HOFFMANN:**  So as I was saying

6    in going over the psyche evaluation by Dr.

7    Wagner indicates that if Mr. Cote is able to

8    maintain his sobriety and free of fighting

9    within the institution, he will have a chance at

10   a successful parole release in the future.

11   Since that time, we don't have an updated

12   psychological evaluation but we do have an

13   updated board report, which indicates that Mr.

14   Cote has both remained -- maintained his

15   sobriety as well as reframe from any violence,

16   115s, wherein the facility.  I hear loud and

17   clear the concerns that the district attorney

18   indicates.  I would just like to refocus

19   everyone's attention to the fact that before the

20   crime that the district attorney describes Mr.

21   Cote was sentenced to first-degree murder with a

22   sentence of seven years to life, before that he

23   was spent the past 30 years in prison.  Mr. Cote

24   mentioned initially his concern that he -- there

25   were going to be special circumstances that

26   would just fie the death penalty and he hoped

27   that that might bring some closure of indication

81

1  to the family, that in fact did not happen, so

2  whatever the circumstances were at his trial he

3  was sentenced to seven to life with the

4  possibility of parole, and after three decades

5  it's my position that he is currently and

6  immediately eligible for release.  One of the

7  significant things that I want to draw the

8  board's attention to is the recent transfer to

9  San Quentin.  During our initial interview, Mr.

10  Cote voiced to me that he thinks that his

11  transfer to San Quentin was the best thing that

12  ever happened to him, that immediately upon

13  voicing he began to take advantage of the

14  opportunities that were available to him.

15  Another thing that I think that is significant

16  about this facility compared to the others is

17  the amount of freedom and responsibility that

18  prisoners here are afforded.  Many other

19  facilities don't have the programming and

20  opportunities that are given here and as a

21  result people in custody don't get to travel,

22  you know, from their housing unit to school or

23  avail themselves of the opportunities.  I think

24  that the transition from a hire security

25  facility into San Quentin that resulted in Mr.

26  Cote being able to avail himself of these great

27  opportunities and do an excellent job is very,

82

1  very significant and I think it's one step

2  toward him proving that if he's given a little

3  bit more freedom and given a better

4  responsibility he's able to handle it very

5  mature manner.  I also would like to bring

6  attention to the fact that admittedly Mr. Cote

7  has a significant amount of disciplinary

8  history.  Deputy Commissioner Sullivan

9  previously stated the number, which was

10 something in the 30s, and at least 25 of those

11 were from 20 years ago or more, so recently Mr.

12 Cote's disciplinary history has been very

13 minimal.  He does offer an excuse for the

14 possession of manufactured alcohol, which is a

15 concern considering his significant drug abuse

16 history.  Without more information I don't

17 necessarily see anything in the record while we

18 shouldn't believe his version of the story.  In

19 terms of violence and assaultive behavior, Mr.

20 Cote has a very, very minimal criminal history

21 prior to arrival in prison, which we discussed

22 earlier and any violence that he has displayed

23 within this institution occurred at least 10

24 years ago at this point.  And as far as his

25 substance abuse history and treatment while he's

26 been in prison, something that we discussed

27 today is that he is not currently going to AA or

83

1    NA or otherwise receiving treatment while he's

2    in this facility, and instead he's chosen to

3    operate educationally and I think that that's a

4    really significant statement that Mr. Cote does

5    recognize the severity of his substance abuse

6    history and that he has gone to AA and NA.   AA

7    was in 1986 and NA later on in the '90s and

8    continued until as recently as 2003 when he took

9    in initiative and chose to focus more on his

10   education because that provided him with the

11   tools necessary to be successful on his release.

12   So that Mr. Cote has chosen to operate

13   educationally, as requested by the board and as

14   a result is unable to continue in AA and NA,

15   should not be held against him but I think

16   instead should be looked at as his ability to be

17   responsible and recognize what sense of tools

18   he's going to need upon his release.   He also,

19   as we know has know has obtained his GED in

20   2005, which I think he should be properly

21   commended for and is currently participating in

22   the San Quentin College program.   I think I will

23   just close with the fact that he has a very

24   supportive board report from 2006, and that

25   being the only recent document that he can base

26   our decision on, from someone who spent three

27   hours with him and who he is been his counselor

84

1   for years and has a good sense (indiscernible)

2   most of us who he is been in the room with him

3   only for a couple of hours the person who has

4   seen him face to face who has watched him on a

5   daily basis for years and is supportive of his

6   release stating that he believes if he stays

7   away from alcohol and drugs Mr. Cote will be an

8   active member of society and I hope that the

9   board offers him an opportunity to do that.

10  Thank you.

11          PRESIDING COMMISSIONER LEE:   Thank you.

12  Mr. Cote, this is your opportunity to speak to

13  the panel?

14          INMATE COTE:   I would like to clarify,

15  if I make brief little statement and then read,

16  if I may, a little bit?

17          PRESIDING COMMISSIONER LEE:   Okay.

18          INMATE COTE:   It is true my education

19  has taught me a lot since I've gotten my GED or

20  received my GED.   You've asked this specific

21  question before, Mr. Lee, about what have I

22  learned about this, and I didn't care when I was

23  out in the streets about drugs or alcohol, it

24  didn't matter to me.   I didn't care.   I was on

25  the denial -- what is it -- I was on the fast

26  track of denial.   I didn't care.   Maybe part of

27  that was some of other penitentiaries that I was

85

1  at as well.  Coming here it helped me, it really
2  has, to understand.  I see it every day guys in
3  orange jumpsuits coming in and out of prison six
4  and seven times.  They just keep coming back and
5  if you asked them why 90 percent of them will
6  tell you I got caught with a bag or trumped up
7  charges with alcohol.  It's always something to
8  do with alcohol or it's got something to do with
9  drugs, that's why they keep coming back.  I
10  don't plan on keep coming back.  I don't have
11  those desires of alcohol drugs in any way,
12  shape, or form.  School has done that, I mean,
13  coming -- like I told my attorney, coming to
14  Quentin was the best thing for me.  It probably
15  saved my life.  With that, I'm going to try --
16  I'm going to try to apologize.  I can't remember
17  what his first name but Mr. McCarthy down there.
18  I'm going to try.
19          Since the age of seven I had
20          been abused by my father.  I
21          wasn't the only one in the
22          family.  My mother would have
23          black eyes and my sisters and
24          brothers would suffer the same
25          fate.  My dad was a controlling
26          man and a constant drunk.  I
27          prayed late at night that I

1    would never turn out to be like

2    he.  As I got older I wanted to

3    do anything I could to hurt him

4    so he could feel what my mother

5    and I did.  I started smoking at

6    the age of 11 with my dad's

7    okay.  His okay was only when he

8    ran out of cigarettes mine were

9    his.  I started smoking weed

10   then drinking his beer and then

11   I went -- when he went to sleep

12   like I said all I wanted to do

13   was hurt my dad.  I did so every

14   chance I could didn't care how

15   bad I hurt him I just kept

16   thinking about how bad -- how he

17   did my mom and myself.  My dad

18   would rather drink than take

19   care of his family.  At the time

20   I didn't know that my dad --

21   that I was -- at the time I

22   didn't know that my dad wasn't

23   the only person I was trying to

24   hurt.  I was hurting the family

25   -- I was hurting the family and

26   friends.  I also hurt the family

27   of the victim Mrs. Rose

1       McCarthy. That kind of pain I

2       don't think could heal let alone

3       -- let alone the family -- to

4       heal the family.  I wish that on

5       the sentencing day that they had

6       sentenced me to death just to

7       make things right to the family

8       of the victim Rose McCarthy,

9       however, that death wouldn't

10      bring her back.  If it could I

11      would surrender.  Please accept

12      this apology.  It would mean a

13      lot to me in every -- I mean, I

14      very sorry for all the pain I

15      have caused the family of the

16      victim Rose McCarthy.  I'm not

17      only asking -- I'm not asking to

18      be forgiven, I jus don't think I

19      have that coming at this time.

20      Once again I'm terribly sorry.

21  Thank you.

22          PRESIDING COMMISSIONER LEE:  Thank you,

23  sir.  At this time we will go to the victim's

24  next of kin.  Because of the problem with the

25  video, Sir for whatever reasons, I'm not sure

26  they corrected them so --

27          DEPUTY DISTRICT ATTORNEY DUNN:  Do you

88

1    want me to hang up and call back in?

2         PRESIDING COMMISSIONER LEE:    No, I

3    would rather not do that simply because of the

4    fact that that may cause more problems, so why

5    don't we just go directly to Mr. McCarthy there

6    to get his statement and then we'll do the

7    statement of Mr. McCarthy here.

8         MR. MCCARTHY:    Thank you.    I'd like to

9    ask the board to deny the parole for the inmate

10   --

11        PRESIDING COMMISSIONER LEE:    Sir?

12        MR. MCCARTHY:    -- and I would like --

13        PRESIDING COMMISSIONER LEE:    Sir?

14        MR. MCCARTHY:    -- and I would like --

15        PRESIDING COMMISSIONER LEE:    Sir, I

16   apologize, would you please give us your name

17   again and indicate your relationship?

18        MR. MCCARTHY:    My name is John McCarthy

19   and I'm Rose McCarthy's son.

20        PRESIDING COMMISSIONER LEE:    Go right

21   ahead.

22        MR. MCCARTHY:    I would like to ask that

23   you deny the parole as requested by the inmate.

24   I would like to remind everyone in the room that

25   the crime was violent to the point that neither

26   my brother or myself were ever allowed to see my

27   mother after the crime took place.    I just

1    cannot tell you how much rampaging through our

2    lives this individual has caused. Rose McCarthy

3    has children, and grandchildren, and great

4    grandchildren, and I know it's been 30 years but

5    I still cannot fathom the amount of brutality

6    that was shown to my mother. She was a small

7    woman. She was not a violent woman and never

8    hurt anyone in her life. She did not deserve

9    what she received from this man. I cannot tell

10   you the pain that he has caused and I would ask

11   that you protect other people in our community

12   from the possibilities that this may happen

13   again at some point. Thank you.

14          **PRESIDING COMMISSIONER LEE:**  Thank you,

15   sir.

16          **MR. MCCARTHY:**  Thank you. Once again

17   my name is Patrick McCarthy. I'm the victim's,

18   Rose Marie McCarthy, youngest son and I'm here

19   to speak on behalf of my mother. I made the

20   trip here to put a human face back on my mother.

21   We talk all about the crime, we talk about

22   parole, we talk, we pass papers back and forth

23   but let me try to refocus this hearing back on

24   the fact that this woman right here, this woman

25   is my mother and that's me and that's my

26   brother. All right. My mother was the nicest

27   person that I am ever going to cross the most

90

1  loving, the most giving person.  Twenty years

2  after her death I would have kids that were in

3  the neighborhood growing up with me that would

4  come to me and tell me how they remember my mom

5  was the nicest person they ever met.  She was

6  the one that always gave them cookies and soda

7  pop and took care of them.  Our house was the

8  house in the neighborhood all the kids would

9  come to play with.  At the time of her murder,

10  my mother was working in a convalescent hospital

11  as a nurse's aide, and I was a paper boy at that

12  convalescent hospital and I would go in and

13  deliver papers to the patients at that

14  convalescent hospital, and people would come out

15  of their way and ask me are you Rose Marie's

16  son, and I would say yes and they would tell me

17  how nice she was and how they couldn't make it

18  without her.  She was the most loving and

19  giving.  Later on 20 years, 30 years, 25 years

20  after her death people death people in the

21  grocery store, when I was up there with my

22  elderly father, before he passed away would

23  recognize me and mention how much missed and had

24  worked with my mother at the convalescent

25  hospital, how much they had missed her, how much

26  they thought she was so nice, all right.  That

27  was my mother she was the den mother.  She was

1  the room mother.  She would take -- she took in

2  three desert tortoises, and puppies, and all

3  kind of animals.  She never harmed, beast, or

4  human, or anything but she had her personal

5  demons like all of us have and that personal

6  demon was alcohol, and that is the thing that

7  made her cross paths with this convicted

8  murderer, and I don't have any sympathy but I

9  have a very, very good memory and I can remember

10  exactly what took place that night.  I can

11  remember the last time I saw her alive when she

12  left the house.  I can remember the banging on

13  my door at 3:00 in the morning with the sheriff

14  deputies in the coroner telling me to put the

15  door away and get your dad up.  I can remember

16  them telling us to sit down on the couch, and I

17  knew it was going to be bad news, but as I sat

18  there with my dad on the couch I just hoped and

19  prayed that they would tell me that she was

20  seriously injured, that she was critically

21  injured, but that if I hurried I might make it

22  to the hospital to hold her hand and whisper in

23  her ear that I loved her before she died, but as

24  they told us what took place and as the words

25  came out of the coroner's mouth that your mother

26  is dead that is when all hope was lost.  There

27  was nothing I could do.  She was gone and as I

92

1  tried to comfort my dad as he screamed out in
2  agony that was the moment when I realized that
3  my life had changed forever.  I was 20 years old
4  then.  I had never had a chance to know my
5  mother as an adult.  I have never had a chance
6  to thank her for everything she did for me.  I
7  have never had a chance to do things for her
8  that I wanted to do for her as she grew old and
9  I was able to take care of her.  My father then
10  told me to call my brother, who had been married
11  less than a month before that, and tell him to
12  be careful and to drive up to the house with his
13  new bride, and my father then told me to tell my
14  brother that our mother was dead.  Not only dead
15  not by a car accident but murdered and that day
16  my dad and my brother and me drove to the
17  cemetery to buy a cemetery plot to bury my
18  mother.  Now during the trial, I was the family
19  representative at the trial.  I was at the trial
20  every single minute.  I was the one that was on
21  the witness stand and I identified my mother
22  through the autopsy photos.  I saw the pictures
23  of her breast with the teeth mark on it.  I saw
24  the pictures -- the last pictures I ever saw of
25  my mother was on an autopsy table with her
26  bruised and battered body.  I know where this
27  crime took place.  You have to walk across a

93

1  major street down a side street to a vegetable

2  path.  I heard every bit of evidence and every

3  bit of testimony.  I -- believe me, I fully have

4  come to terms and realize that my mother was

5  kicked to death after being raped.  There was

6  semen found on her body.  She was naked to die -

7  - to drawn in her own blood in the vegetable

8  table path alone.  Now, I don't know how much

9  more brutal of a crime that could have been.

10  This wasn't a crime of passion in a bar between

11  two men.  This was a five-foot nothing 98-pound

12  woman who unfortunately found her place in a

13  place where an individual was going to do that

14  one way or the other.  This wasn't just a crime

15  of circumstance this was going to happen to

16  somebody, someway, somehow.  I completely

17  guarantee that was going to take place.  So what

18  I got to do is I got to, just because of the

19  fluke of the law because of the Supreme Court at

20  the time there was no death penalty.  All right,

21  it was murder in the first degree.  There was no

22  life at that time.  I've gone to hearing at five

23  different prisons over the years.  As far as I'm

24  concerned, I should have came to this San

25  Quentin prison one time and that's one time only

26  and to see the convicted murder of my mother at

27  his execution, but that's not going to happen.

1  So instead I have to come to there's hearings.
2  I grieve for my mother every single day of my
3  life but every two to three to five years I have
4  to revisit this crime and the loss of my mother
5  to come to these hearings.  I watched my father
6  grow old and die alone because he did not have a
7  mother -- I mean his wife because my mother was
8  murdered.  By brother and I are her only two
9  sons.  She had a few miscarriages because she
10  wanted to have a girl.  Well, she has six
11  grandchildren, four of which are girls.  I have
12  two daughters my brother has two daughter and
13  two sons and I watched my daughters grow up
14  knowing what a hole is in their lives by not
15  knowing the love of their grandmother and how
16  their grandmother would have just spoiled them
17  to death and I would have -- I was denied the
18  opportunity to watch my daughters grow up with
19  their grandmother and I tried to keep her memory
20  alive but I wasn't able to do it.  She has five
21  grandchildren now.  The last granddaughter born
22  was named Abigail Rose after her great
23  grandmother.  This convicted murderer said he
24  didn't want to hurt his mom.  Well, I didn't
25  want anybody to hurt my mom either but I failed
26  her and perhaps this is part of my penance is to
27  come to these things and deal with this for the

95

1 rest of my life. Because of this I have become

2 overprotective of everybody that I love. This

3 individual has the nerve to say that she was

4 trying to sell him heroin. All I hear is

5 excuses, after excuses, after excuses. Thirty-

6 four, 115s; how many times does an individual

7 have to mess up to kind of figure out that

8 that's not unusual that is the pattern. He

9 talks about his GED, well, you know what all of

10 her grandchildren graduated from high school and

11 they're graduating from college now and my

12 mother can't go to their graduation and applaud

13 their high marks. There's only one victim here

14 and that's my mother. I can't get letters from

15 my mother anymore. I go to the graveyard to

16 visit my mother and I place flowers on her

17 headstone. That's the way I visit my mother.

18 As I said, I don't have any sympathy. I have a

19 very good memory and the only thing that this

20 board can do for me -- justice slow and coming

21 is justice not at all. After 30 years there is

22 no justice in this case. The only thing that

23 can happen as far as I'm concerned is for me to

24 stand on this man's grave one day. That's the

25 only thing because that will finally end this

26 situation for me. My mother On the other hand

27 I'm sure would have forgiven him because that's

96

1  the kind of person she is, but I do not forgive

2  and I do not forget, and as long as I'm alive

3  I'm going to do whatever I possibly can to make

4  sure that there isn't a knock on somebody else's

5  door at 3:00 in the morning and another son, or

6  daughter, or husband -- because I know the next

7  victim will be a female again, the weakest

8  members in society, I want to make sure at this

9  point that nobody else will have to go through

10  that moment that I went through when I had no

11  hope of ever seeing my mother again and I don't

12  want anybody else to live with the idea of their

13  last vision of their mother with a battered beat

14  up face on an autopsy page.  So there's nobody

15  here that can take accountability for that

16  accept this convicted murder and even if he did

17  that would not change the fact that he's a

18  violent individual.  He always was a violent

19  individual.  He will always be a violent

20  individual and as far as I'm concerned the

21  responsibility of this board is to make sure

22  that he does not ever harm another person

23  outside of prison again because nobody here in a

24  decision making position nobody in this room --

25  it's going to be the victim it's going to be

26  else somebody else out there.  He says the best

27  thing that he ever did was come to San Quentin

97

1   well then the best thing that can ever happen is

2   for him to stay in San Quentin.  That's all I

3   have to say.  Thank you for you time.

4           PRESIDING COMMISSIONER LEE:  Thank you,

5   sir.  At this time we're going to go into

6   recess.  We will deliberate and call everyone

7   else in when we've made a decision.

8                   R E C E S S

9                   --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

98

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2    D E C I S I O N

3    DEPUTY COMMISSIONER SULLIVAN:    We are

4    back on the record.

5    PRESIDING COMMISSIONER LEE:    Thank you.

6    The panel has reviewed all information received

7    from the public and relied on the follow

8    circumstances in concluding the prisoner is

9    suitable for parole and would pose an

10   unreasonable risk of danger to society or a

11   threat to public safety if released from prison.

12   The offense was carried out in an especially

13   cruel and callous manner.    The victim was abused

14   defiled and mutilated during the offense, which

15   was carried out in a manner, which demonstrates

16   an exceptional callous disregard for human

17   suffering.    The motive of the crime was

18   inexplicable and very trivial in relationship to

19   the offense.    The facts of this case cannot be

20   described any other way (indiscernible).    We

21   have a woman who apparently was not very large.

22   Here was an individual who apparently not only

23   is larger individual but apparently trained in

24   martial arts and the military.    From the

25   description of the wounds, it was very clear

26   that she was literally beaten to death.    The

27   ROBERT COTE B-81066 DECISION PAGE 1 04/20/06

1  offense itself truly qualifies in this

2  particular regard as especially cruel and

3  callous and in the commitment offence it is

4  sufficient alone in and of itself

5  (indiscernible).  The other reasons for the

6  denial; is that the inmate has previous record,

7  he has an escalating pattern of criminal

8  conduct, and he has a history of unstable and

9  tumultuous relationships with others.  He has

10  failed at previous grants of probation and

11  cannot be counted upon to (indiscernible)

12  criminality.  He has failed to profit from

13  society's previous attempt to correct his

14  criminality including adult probation and county

15  jail.  The inmate has not sufficiently

16  participated in self-help and therapy programs.

17  He has 34 serious disciplinary reports related

18  from a few years ago until 2001.  The inmate

19  lacks realistic parole plans in that he does not

20  have acceptable employment plans, and the

21  hearing panel notes that pursuant to 3042 there

22  is opposition by the District Attorney's Office

23  of Riverside County.  The panel makes the follow

24  findings; the prisoner needs therapy, self-help,

25  and programming in order to face, discuss

26  understand in coping in dealing with stress in a

27  ROBERT COTE B-81066 DECISION PAGE 2 04/20/06

100

1  nondestructive manner, as well as to get further

2  insight into the crime.  Until progress can be

3  made the prisoner continues to be an

4  unpredictable and a threat to others.  The

5  prisoner's gains are recent.  In the past he

6  attempted to (indiscernible) himself, however,

7  he must demonstrate an ability to maintain these

8  gains over an extended period of time.

9  Nonetheless, the prisoner should be commended

10  for the follow.

11        **DEPUTY COMMISSIONER SULLIVAN:**  Sir, you

12  should be commended for receiving your GED.  I'm

13  sure that took a lot of work and based on what

14  your teacher said about you and the fact that

15  you were elected to be valedictorian in that

16  class, you should be very proud of yourself for

17  that and I want to make sure that you understand

18  the board takes it very seriously that you went

19  to the effort to do that.  Also we appreciate

20  the fact that your attorney (indiscernible).

21        **PRESIDING COMMISSIONER LEE:**  However,

22  these positive aspects of behavior do not

23  outweigh the factors of unsuitability.  In a

24  separate decision the hearing panel finds that

25  the inmate has been convicted of murder and it

26  is not reasonable to expect that he would be

27  **ROBERT COTE B-81066 DECISION PAGE 3 04/20/06**

101

1  granted a date in the next three years.  The

2  prisoner committed the offense in an especially

3  cruel manner as previously discussed.  The

4  victim was abused, mutilated, as well as raped.

5  The offense was carried out in a manner, which

6  demonstrates an exceptional callous disregard

7  for human suffering.  The motive for the crime

8  was inexplicable and very trivial in

9  relationship to the offense.  The prisoner has a

10 history of unstable tumultuous relationships

11 with others and, sir, I don't know how to stress

12 this upon you.  The previous panels have

13 stressed this upon you.  It is your choice.  We

14 can't force you to do this but you need to get

15 involved in some kind of drug rehab.  I don't

16 care which one you do it doesn't matter to me.

17 If you find one that's equivalent to AA and NA

18 you have to do it.  AA and NA the only why we

19 push those is because that's the best program

20 let's be honest.  We don't have anything that

21 has a better track record than AA and NA.  The

22 prisoner has not completed necessary

23 programming, which is essential to your

24 adjustment, and needs additional time to gain

25 such programming.  Now that have your GED, I

26 think it's imperative that you participate in AA

27 **ROBERT COTE B-81066 DECISION PAGE 4 04/20/06**

102

1   and NA.  The brutality of this crime is such,

2   and your statement to this panel are such that

3   clearly indicates that you were not thinking

4   correctly when you were out there that day, and

5   one would hope, and I'm only saying this because

6   you don't remember very clear that part of that

7   was drug induced or alcohol induced not because

8   you were just a savage human being.  You need to

9   indicate to the panel, if you ever wish to get a

10  date, that you are serious about ever, ever

11  being involved in drugs or alcohol.  Just saying

12  that I choose not to take it does not preclude

13  the option that may some day choose to take it

14  once again.  Do you understand what I'm saying?

15  The reason why AA and NA is accepted by a lot of

16  associations is because their premise.  The

17  basic premise is you know what you need help and

18  they are people that you need -- you can get

19  help from other people involved in the group,

20  other people who have gone through the group,

21  staff members, and your higher power.  It

22  doesn't matter what your higher power is, so

23  it's essential that if you ever wish to get a

24  date that you are involved in some type of AA

25  and NA so that you can basically indicate that

26  you are not involved in alcohol as well as

27  **ROBERT COTE B-81066 DECISION PAGE 5 04/20/06**

1   drugs.  Therefore a longer period of observation

2   and evaluation of the prisoner's requirements is

3   needed by the board to find the prisoner

4   suitable for parole.  The panel recommends the

5   follow; become disciplinary free, participate in

6   self-help.  Deputy Commissioner?

7           DEPUTY COMMISSIONER SULLIVAN:  Sir, the

8   comments you made today about the commitment

9   offence, in my opinion, were less than honest.

10   Some of the comments made today about your

11   offense have been less than honest, in my

12   opinion, and I would -- that probably with the

13   fact that you're not participating in substance

14   abuse treatment makes me think that you don't

15   have a realistic idea the effect this crime has

16   had on everybody, and I would urge you in the

17   next three years to explore that and give this

18   panel some explanation of those things.  I wish

19   you the best of luck and I hope that you take my

20   comments seriously.  I'm telling it to you

21   because I am trying to help you understand what

22   it takes to be suitable for parole.

23   //

24   //

25   //

26   //

27   ROBERT COTE B-81066 DECISION PAGE 6 04/20/06

104

1          **PRESIDING COMMISSIONER LEE:**    All right.

2    This hearing is dismissed.

3                         --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED THREE YEARS

24    THIS DECISION WILL BE FINAL ON:_____AUG 1 8 2006_____

25    YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    ROBERT COTE B-81066 DECISION PAGE 7 04/20/06

105

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, FELICIA TOWNSEND, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do hereby
declare and certify under penalty of perjury that I
have transcribed tape(s) which total one in number and
cover a total of pages numbered 1 - 104, and which
recording was duly recorded at CALIFORNIA STATE
PRISON, SAN QUENTIN, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING OF ROBERT
COTE, CDC NO. B-81066, on April 20, 2006, and that the
foregoing pages constitute a true, complete, and
accurate transcription of the aforementioned tape to
the best of my ability.

I hereby certify that I am a disinterested
party in the above-mentioned matter and have no
interest in the outcome of the hearing.

Dated May 12, 2006, at Sacramento, California.

Felicia Townsend
Transcriber
**PETERS SHORTHAND REPORTING**